UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

RANDY COPLEY, KENNETH
MCLAUGHLIN, and JOSHUA WOOD,

        Plaintiffs,

  v.

CITY OF LOWELL,

        Defendant.

Civil Action No. 14-10270

---

## COMPLAINT

Plaintiffs Randy Copley, Kenneth McLaughlin, and Joshua Wood (collectively,

"Plaintiffs"), by and through their attorneys, hereby allege as follows:

### INTRODUCTION

1.　　This is an action brought under 42 U.S.C. §1983, the First and Fourteenth

Amendments to the United States Constitution, the Massachusetts Civil Rights Act (G.L. c. 12,

§ 11I), and the Massachusetts Declaration of Rights, for declaratory and injunctive relief against

the City of Lowell (the "City"), arising out of the City's recent adoption of an anti-"panhandling"

ordinance, Lowell Ordinance Ch. 222, s. 222.15 (the "Ordinance").  The Ordinance, which the

City first adopted on November 12, 2013 and amended on February 4, 2014, is part of an explicit

attempt to eliminate "panhandling"—the solicitation of donations by the homeless—within

downtown Lowell, while permitting everyone else to continue soliciting.

2.　　The Ordinance originally discriminated against panhandling explicitly, by

exempting from its reach solicitation by 501(c) tax exempt organizations and people not

soliciting on their own behalf.  Realizing this was blatantly content-based speech discrimination,

the City *expanded* the Ordinance to restrict *all* solicitation, while preserving its anti-panhandling intent by adding a provision giving the police discretion to selectively enforce the Ordinance.

3.    Nevertheless, the Ordinance remains content-based because it treats solicitation for immediate donations of money differently than requests for other items of value—like a request for commitments for future charitable giving.  But even if the Ordinance is not content-based, a ban on all solicitation in most of downtown Lowell is massively overbroad and thus violates the First Amendment, and the limitless police discretion bestowed by the Ordinance violates Plaintiffs' right to due process.

4.    The Ordinance provides: "Panhandling is prohibited within the Downtown Lowell Historic District.  Any police officer observing any person violating this provision *may* request or order such person to cease and desist in such behavior and *may* arrest such person if they fail to comply with such request or order."  C.O. c. 222, § 222.15 (emphasis added).

5.    The Ordinance defines "panhandling" broadly to encompass (1) "solicitation of any item of value, monetary or otherwise, made by a person requesting an immediate donation of money or exchange of series" and (2) "any person, acting on his/her own behalf, attempting to sell an item for an amount far exceeding its value or an item which is already offered free of charge to the general public, and under circumstances a reasonable person would understand that the purchase is in substance a donation."  *Id.*

6.    The Ordinance also bans panhandling in an "aggressive manner" in downtown Lowell.  The Ordinance defines an "aggressive manner" to include a broad range of peaceful speech, including soliciting donations from anyone waiting in line for any purpose, continuing to solicit a person after he/she has declined to donate, and soliciting within 20 feet of a number of public locations, including any public restroom, payphone, bus stop, theater, outdoor café or

2

restaurant, or outdoor seating area of any business.  A police officer who observes a violation of this provision "*may* arrest such person."  C.O. c. 222, § 222.15 (emphasis added).

7.     Plaintiffs are individuals who regularly solicit immediate donations or engage in protected speech in Lowell.  By adopting the anti-"panhandling" ordinance, the City has significantly restricted Plaintiffs' constitutionally protected speech, in violation of the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.

8.     In addition, by passing the Ordinance, the City has impermissibly targeted the homeless in violation of the Equal Protection Clause of the Fourteenth Amendment.

9.     Further, the Ordinance's definition of "aggressive manner" is unconstitutionally vague.  To take but one example, the Ordinance makes it "aggressive" to "continu[e] to engage in panhandling toward a person after the person has given a negative response to such soliciting."  C.O. c. 222, § 222.15(A)(3)(b).  It is unclear how this would apply to many common situations, such as a panhandler continuing to hold a sign asking for money after one passerby refuses to give.  Plaintiffs are left without sufficient notice of what constitutes a violation of the Ordinance because the Ordinance does not define with adequate specificity the types of conduct meeting the definition of "aggressive manner."

10.     The Ordinance is also unconstitutionally vague for its prohibition on the sale of an item "for an amount far exceeding its value . . . under circumstances a reasonable person would understand that the purchase is in substance a donation."  *Id.*  Plaintiffs are left without sufficient notice of what constitutes a violation of the Ordinance because the Ordinance does not define with adequate specificity the types of sales that it forbids.

11.     Plaintiffs seek a judgment under 42 U.S.C. § 1983, 28 U.S.C. § 2201, and Mass.

Gen. Laws ch. 12, § 11I, that the Ordinance is an unconstitutional violation of Plaintiffs' rights to freedom of speech, due process, and equal protection under the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.  Plaintiffs also seek preliminary and permanent injunctive relief in the form of an order enjoining the City from applying or enforcing this ordinance.

## THE PARTIES

12.     Plaintiff Randy Copley is a resident of Lowell.

13.     Plaintiff Kenneth McLaughlin is a resident of Lowell.

14.     Plaintiff Joshua Wood is a resident of Lowell.

15.     The Defendant City of Lowell is a municipal corporation incorporated under the laws of Massachusetts.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1988, as this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.  The Court also has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over the City because it is a resident of Massachusetts.

18.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (2) because the City of Lowell is located within this district, and a substantial part of the events or omissions giving rise to the claims occurred within this district.

## FACTS

### The Challenged Ordinance

19.     The challenged Ordinance is the latest measure in the Lowell City Council's ongoing effort to drive out the City's homeless.

20.      In 2008, City Councilor Kazanjian suggested moving the Lowell Transitional Living Center, a homeless shelter, from Middlesex Street, Lowell to the Tewksbury hospital. The City Councilors unanimously voted to have the City Manager and Police Superintendent meet with representatives of the Lowell Transitional Living Center to alleviate concerns about the Center, which Councilor Donoghue described as a "cancer" on the surrounding neighborhood.

21.     In 2011, the City Council voted to oppose the move of Living Waters, a Christian nonprofit that provides support to the homeless, to the downtown gym of Saint Anne's Episcopal Church.

22.     More recently, in May 2013, the City Manager followed through on a City Council vote, spearheaded by City Councilor Marty Lorrey, to clear three homeless encampments along the Merrimack and Concord Rivers in Lowell.  The City Manager worked with city, state and federal agencies to destroy the camps, where more than a dozen people lived year-round.

23.     Two months later, Councilor Lorrey proposed, during a July 9, 2013 City Council meeting, that the City ban panhandling, stating that the Council had to "protect the city business owners" and to "send out a message, not in Lowell" to panhandlers.

24.     During the July 9 meeting, several Councilors openly expressed support for Councilor Lorrey's proposed ban on panhandling and agreed that the measure could bring about

their desired outcome:  getting the homeless out of downtown.

25.     For instance, Councilor John Leahy said that the proposal would help the Lowell Police Department do more than "move the panhandlers along so they're not bothering people." Also supporting the proposed ban, Councilor Rodney Elliott complained that panhandling "doesn't set a good presence downtown" and supported efforts to give police more authority to prohibit the activity.

26.     In proposing the ban on panhandling, Councilor Lorrey drew distinctions between solicitations made by "people [] in need"—which he and other City Councilors disapproved of—and solicitations made by other individuals and groups—which he viewed positively.  To protect what he described as "legitimate" solicitation, Councilor Lorrey proposed issuing permits that would allow charitable and other similar organizations to solicit funds.  He cited "raising money with the post office for charity [at various] intersections," "firefighters [raising money] with their boots," and "bucket brigades" raising money for a "folk festival" as acceptable forms of solicitation.

27.     During the July 9 meeting, the only interests raised by Councilors in support of a ban on panhandling were to protect business owners from panhandling and prevent citizens from being solicited by the panhandlers.

28.     As a result of the July 9 meeting, the City Council asked the City manager to have a proper City department advise the Council on a plan that would eliminate "panhandling" in Lowell.

29.     In response to the Council's request for advice, the City Solicitor prepared an opinion letter outlining the legal considerations related to regulating panhandling.

30.     The letter noted that anti-"panhandling" ordinances have serious "First

Amendment implications" because "courts have found that the act of panhandling is inextricably linked to the expression of free speech, whether verbal or otherwise."  To avoid the First Amendment issues, the City Solicitor recommended both more consistent enforcement of existing laws and adopting a new anti-panhandling ordinance.

31.     Regarding existing laws, the City Solicitor emphasized that Lowell and Massachusetts law already prohibit "unwanted touching or verbal harassment," "loitering in public transportation facilities, which includes the garages" as well as "jaywalking and soliciting business in the street," and that consistent enforcement of these laws would address some of the negative behaviors occasionally associated with panhandling.

32.     In order to survive judicial scrutiny, the City Solicitor advised the Council that any new ordinance banning panhandling be framed to address a government interest, such as supporting tourism in the downtown historic district—although an interest in tourism had not previously been mentioned by the City Council.

33.     On October 15, 2013, after receiving the City Solicitor's opinion letter, the City Council once again took up the issue of banning panhandling.  The Councilors continued to express their desire to treat solicitations from the homeless differently from solicitations from other people and organizations.  Councilor Lorrey stated that there is "an easy distinction" between "musicians" and "other charitable organizations" asking for money and panhandling by the homeless.  He also emphasized that "we have to be careful on how that ordinance is written" in order to protect solicitation by non-homeless people.  In addition, Councilor Rita Mercier stated that people who "promote themselves through entertainment or whatever and have the cup down there or a hat" are completely different from homeless panhandlers.  The Council requested that the law department draft an ordinance to ban panhandling.

34.     On October 29, 2013, the Council received the draft ordinance and sent it to a public hearing.  Like the current version of the Ordinance, this version banned panhandling in the Downtown Lowell Historic District.  Unlike the current Ordinance, however, this version exempted "any non-profit, religious, civic or benevolent organization described in Section 501(c) of the Internal Revenue Code" from the solicitation ban.  It also exempted any solicitor who was not "acting on his/her own behalf."  This version also did not provide for police discretion in enforcement, nor did it include a ban on panhandling in an "aggressive manner."

35.     On November 12, 2013, the Council held a public hearing on the proposed ordinance.  Comments at the public hearing demonstrate that the Ordinance was enacted to prevent the inconvenience of business and individuals in Lowell.  Only one member of the public, Councilor-elect Corey Belanger, spoke in favor of the ordinance, and he supported the ordinance as a way to prevent "businesses and residents" from being "inconvenienced."

36.     In contrast, nine members of the public spoke against the Ordinance and testified that, in their experience, genuinely aggressive panhandling is not an issue in Lowell and, even if it was, existing laws were adequate to deal with the problem.

37.     The City Council nonetheless voted to approve the Ordinance immediately following the public hearing.

38.     According to a December 10, 2013 article published in the Nashua Telegraph, Patrick Murphy, Lowell's Mayor, opposed the Ordinance.  He told the paper that he does not "think there's a widespread issue with panhandling" in Lowell, and described fining a panhandler as "bizarre."  The Ordinance, according to Mayor Murphy, was passed because it was "driven by a small minority" on the City Council.

39.     In the preamble to the Ordinance, the City Council justified the ban on

panhandling as eliminating "nuisance activity" that it asserted, without evidence, "substantially burdens tourism within the Downtown Historic District."

40.     Prior to the City Solicitor's October 10, 2013 opinion letter, protecting and promoting tourism was never mentioned as the major concern behind the Ordinance by any of the City Councilors at any of the Council meetings discussing the Ordinance.  Prior to passing the Ordinance, the City Council meeting minutes contain no research or other quantitative information regarding impacts of panhandling on tourism within the Downtown Lowell Historic District.

41.     In response to a possible constitutional challenge, on January 7, 2014, the City Council considered amendments to the Ordinance and sent the issue to an executive session on pending litigation.  On January 14, 2014, the City Council voted to send proposed amendments to the Ordinance to public hearing.

42.     On February 4, 2014, after a public hearing, the City Council adopted the amendments by a vote of nine to zero.

43.     The amendments to the Ordinance removed the exemptions for 501(c) organizations and for people not soliciting on their own behalf—extending the panhandling ban to *all* solicitation for immediate donations in downtown Lowell.

44.     The amendments also added a provision giving police officers total discretion against whom to enforce the Ordinance.  Specifically, the City Council added the following sentence to the Ordinance:  "Any police officer observing any person violating this provision *may* request or order such person to cease and desist in such behavior and may arrest such person if they fail to comply with such request or order."  (emphasis added).

45.     The City Council also added a prohibition on panhandling in an "aggressive

manner" in downtown Lowell.  As amended, the Ordinance defines "aggressive manner" broadly

to encompass, among other things, the following activity:

> (b) continuing to engage in panhandling toward a person after the
> person has given a negative response to such soliciting;

> \* \* \*

> (g) panhandling toward anyone who is waiting in line for tickets,
> for entry to a building or for any other purpose;

> \*\*\*

> (10) [sic] panhandling within 20 feet of the entrance to, or parking
> area of, any bank, automated teller machine, automated teller
> machine facility, check cashing business, mass transportation
> facility, mass transportation stop, public restroom, pay telephone
> or theatre, or of any outdoor seating area of any café, restaurant or
> other business.

46.     The combined effect of the amended Ordinance is that the police will have the

discretion to ask anyone soliciting immediate donations in downtown Lowell at any time to stop

soliciting and, if they refuse, to arrest them; and that the police may directly arrest any person

soliciting immediate donations in an "aggressive manner" without asking them to stop soliciting.

47.     The City justified the ban on "aggressive" panhandling based on its interest in

"establishing certain reasonable time, place, and manner regulations whenever First Amendment

activities such as . . . panhandling . . . affect the safety or wellbeing of any person(s)."

48.     A preamble to the amendment claims that the Lowell Police Department received

237 calls related to panhandling in the first eleven months of 2013, and that "some" of them

involved "aggressive behavior."  It does not state whether any of the calls—let alone the "some"

of the calls that involved "aggressive behavior"—involved each category of conduct banned by

the Ordinance.

**The Downtown Lowell Historic District**

49.     The Downtown Lowell Historic District is defined in Section 4 of Chapter 566 of the Acts of 1983, "An Act Establishing the Downtown Lowell Historic District."  C.O. c. 222, § 222.15.



50.     The Downtown Lowell Historic District includes approximately four hundred acres in central Lowell, including the private buildings located with that area.  C.O. § 157.26.

51.     The Downtown Lowell Historic District is not limited to tourist destinations.  It contains many businesses and areas that are not tourist attractions.

52.     For example, the Downtown Lowell Historic District contains Central Plaza, a strip mall shopping plaza with business such as the Rent-A-Center, Rite Aid, and the Family Dollar store.

53.     Other non-tourist attractions and businesses are prevalent in the Downtown Historic District, including additional dollar stores, auto supply stores, wholesale distributors,

liquor stores, pawn shops, cash for gold stores, and Dunkin' Donuts.





**The Plaintiffs**

54.     Plaintiff Randy Copley is a resident of Lowell who has been homeless for approximately 2 years.  Mr. Copley relies on a number of services for the homeless that are located in, or in close proximity to the Downtown Lowell Historic District, specifically, the Living Waters Center, Eliot's Presbyterian Church, and the Lowell Transitional Living Center. Since the Ordinance was adopted, Mr. Copley has restricted his panhandling in the Downtown Lowell Historic District out of fear of enforcement.

55.     Plaintiff Kenneth McLaughlin is a resident of Lowell who has been homeless for approximately 5 years.  Mr. McLaughlin relies on a number of services for the homeless that are located in, or in close proximity to the Downtown Lowell Historic District, specifically, the Living Waters Center and Bridgewell's health center.  Since the Ordinance was adopted, Mr. McLaughlin has restricted his panhandling in the Downtown Lowell Historic District out of fear

13

of enforcement.

56.     Plaintiff Joshua Wood is a resident of Lowell who has been homeless for approximately 4 years. Mr. Wood relies on a number of services for the homeless that are located in, or in close proximity to the Downtown Lowell Historic District, specifically, the Living Waters Center, Eliot's Presbyterian Church, Bridgewell's Pathfinder Residential and Drop-in Center, and Christ Church United's Under the Oak program.  He believes he derives mental stability from being able to obtain money for necessities by panhandling.  Since the Ordinance was adopted, Mr. Wood is afraid to panhandle in the Downtown Lowell Historic District.

57.     Plaintiffs regularly stand on the sidewalk in the Downtown Lowell Historic District and ask people for money.  None of the Plaintiffs consider their solicitations to be aggressive; they do not request money in a forceful or assertive manner.  They do not target tourists.  Plaintiffs rely on the donations they receive for necessities, including their co-pays for prescription drugs.  This Ordinance has made it more difficult for the Plaintiffs to obtain enough money for necessities.

### The Ordinance Is An Unconstitutional Content-Based Restriction on Speech

58.     "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  Government regulations that are based on content are therefore "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).  Regulations are content-based when they "impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994).  A content-neutral regulation, on the other hand, "places no restrictions" on "any subject matter that may be discussed."  *Hill v. Colorado*, 530 U.S. 703, 723 (2000).

59.     Lowell's anti-"panhandling" Ordinance restricts speech based on content because it restricts only solicitations for an "immediate donation of money"; the Ordinance permits other types of solicitations, like requests for future donations of money, or signatures for a petition. *See Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 556 (4th Cir. 2013).  The Ordinance also prohibits only charitable solicitation, allowing solicitation for commercial sales, even if immediate.  *See Auburn Police Union v. Carpenter*, 8 F.3d 886, 892-93 (1st Cir. 1993); *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 796 (9th Cir. 2006).

60.     A content-based regulation is subjected to "the most exacting scrutiny." *Turner*, 512 U.S. at 641-42.  Such a regulation is only constitutional if it is the least restrictive means of advancing a compelling government interest.

61.     The only government interest the City has identified to justify its ban on all solicitation in downtown Lowell is promoting tourism, which is not a compelling government interest with respect to an expansive downtown area.  *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005); *see also Ackerley Commc'ns of Massachusetts, Inc. v. City of Somerville*, 878 F.2d 513, 521 (1st Cir. 1989) ("[W]e think it highly unlikely that aesthetics ever could be a sufficient justification for a penalty on speech.").

62.     Because the ban on solicitation in downtown Lowell is a content-based restriction on speech that advances no compelling government interest, it cannot survive review under the First and Fourteenth Amendments to the United States Constitution and Article XVI of the Massachusetts Declaration of Rights.

### The Ordinance Is Unconstitutionally Overbroad

63.     The Ordinance also violates the First Amendment because it is overbroad.

64.     The United States Supreme Court "has characterized the freedom of speech and

that of the press as fundamental personal rights and liberties.  The phrase is not an empty one and

[is] not lightly used."  *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939) (footnote omitted).  "It

has become axiomatic that '[p]recision of regulation must be the touchstone in an area so closely

touching our most precious freedoms.'"  *United States v. Robel*, 389 U.S. 258, 265 (1967)

(quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

65.     "In places which by long tradition or by government fiat have been devoted to

assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed.

At one end of the spectrum are streets and parks which 'have immemorially been held in trust for

the use of the public, and, time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens, and discussing public questions.'"  *Perry Educ. Ass'n

v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496,

515 (1939)).

66.     Accordingly, even content-neutral regulations of speech in traditional public fora

must be "narrowly tailored to serve a significant government interest, and leave open ample

alternative channels of communication."  *Id.*

67.     To satisfy the narrow tailoring requirement, "the Government . . . bears the

burden of showing that the remedy it has adopted does not 'burden substantially more speech

than is necessary to further the government's legitimate interests.'"  *Turner*, 512 U.S. at 665

(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).  Restrictions "not only must

. . . serve a 'sufficiently strong' or 'significant governmental interest,' they must significantly

serve that interest."  *John Donnelly & Sons v. Campbell*, 639 F.2d 6, 8 (1st Cir. 1980), *aff'd*, 453

U.S. 916 (1981).

68.     Alternative channels of communication that "involve more cost and less autonomy" to speakers, that "are less likely to reach persons not deliberately seeking" the protected speech, and that "may be less effective media for communicating the message," do not constitute ample alternative channels for protected speech. *Linmark Assocs., Inc. v. Twp. Of Willingboro*, 431 U.S. 85, 93 (1977).

69.     Lowell's Ordinance is, on its face, overly broad and unconstitutionally infringes Plaintiffs' rights to freedom of speech and expression by restricting a substantial volume of peaceful, non-threatening, and constitutionally protected speech without adequate justification.

70.     The total solicitation ban in downtown Lowell could not be more overbroad.  It bans everything from a homeless woman peacefully requesting food or money for her children, to a Salvation Army volunteer ringing a bell during the holidays, to a driver asking a friendly passerby for change to feed her meter, to a music student performing on the street with a sign asking for donations to help with tuition or to fund a local folk festival.  No state interest—and especially not the state's interest in promoting tourism—could justify such a sweeping restriction on protected speech.

71.     Lowell's ban on solicitation in an "aggressive manner" is also overbroad. Although Lowell certainly has an interest in preventing violent and threatening behavior, the ban on "aggressive" panhandling sweeps in a significant amount of speech that could not reasonably be characterized as "aggressive."

72.     For example, subsection (b) prohibits solicitation "after the person has given a negative response to such soliciting."  Prohibiting a solicitor from calmly requesting that a passerby reconsider his or her initial decision not to donate money bans a large range of peaceful

17

conduct unrelated to tourism or safety threats.  It could prohibit a homeless person from holding a sign asking for money that would be visible to someone who already refused to give.

73.     Subsection (g) prohibits all solicitation, no matter how peaceful, from anyone waiting in line for anything.  This prevents a homeless man from sitting on a bench with a sign requesting money that is visible to people waiting in line to buy movie tickets, an activity that could not possibly be perceived as threatening.

74.     Subsection (10) creates countless no-solicitation zones throughout Lowell by prohibiting solicitation within 20 feet of the entrances or parking areas of theaters, ATMs, banks, public restrooms, bus stops, pay telephones, and seating areas of outdoor cafes or restaurants. The Ordinance thus prohibits a homeless person from sitting quietly on a sidewalk, ten feet away from a bus stop, with a sign that says "Homeless – Please Help," conduct that could not possibly be construed as a threat.

75.     There is no evidence that the peaceful and non-intrusive solicitation banned by the Ordinance adversely impacts tourism in the Downtown Lowell Historic District, or creates any threat to safety.  The February amendments assert that the Lowell Police Department received 237 calls "related to panhandling" in 2013, and that "[s]ome" of these calls involved aggressive behavior.  But there is no indication what was aggressive about these "some" incidents, nor how that conduct maps onto the aggressive panhandling ordinance that was passed.  The City cannot ban all peaceful solicitation in hundreds of buffer zones in downtown every day by pointing to small number of incidents of aggressive panhandling over the course of a year.

76.     The Ordinance also fails to leave open adequate alternate channels of communication.  By depriving individuals of the use of the sidewalks and streets of downtown Lowell to engage in protected speech, the Ordinance forces individuals to take their speech to

less busy and populous parts of the city, which are significantly less effective locations for soliciting donations.

77.     Because the Ordinance is not narrowly tailored to any significant government interest, and fails to leave open ample alternative channels of communication, it cannot survive review under the First and Fourteenth Amendments to the United States Constitution and Article XVI of the Massachusetts Declaration of Rights.

## The Ordinance Is Unconstitutionally Vague

78.     "[A] law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Where a statute "is capable of reaching expression sheltered by the First Amendment, the [void for vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

79.     In the First Amendment context, "[t]he prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement . . .  The question is . . . whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (citing *Kolender v. Lawson*, 461 U. S. 352, 357-58, 361 (1983)). The prohibition against vague laws thus prevents the legislature from "set[ting] a net large enough to catch all possible offenders," either to "leave it to the courts to step inside and say who could be rightfully detained and who should be set at large," or to "increase the arsenal of the police." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165 (1972). A law "accords the police unconstitutional discretion in enforcement" when its "plain language is admittedly violated scores of times daily, yet only some individuals—those chosen by the police in their unguided discretion—are arrested." *City*

*of Houston v. Hill*, 482 U.S. 450, 466-67 (1987).  The power of lawmaking should not be left "to the moment-to-moment judgment of the policeman on his beat."  *Goguen*, 415 U.S. at 575.

80.     By its plain terms, the Ordinance violates this basic principle.  The Ordinance sets a massive net, prohibiting all solicitation of immediate donations—by anyone and for any purpose—and then explicitly gives the police discretion as to who should be reeled in.  To prevent anyone favored by the police from being deterred from soliciting, the Ordinance requires the police to request the solicitor to stop soliciting before arresting the person.  This discretion is particularly problematic when the City Council has made perfectly clear who it wants subjected to the Ordinance—panhandlers—and who it does not want to be so subjected—everyone else.

81.     Lowell's Ordinance is also unconstitutionally vague because it fails to define the prohibited conduct with adequate specificity, leaving Plaintiffs without sufficient notice as to what constitutes a violation of the statute.

82.     Most problematic is the ambiguity presented in the Ordinance's definition of "aggressive manner."  For example, the Ordinance makes it "aggressive" to "continu[e] to engage in panhandling toward a person after the person has given a negative response to such soliciting."  C.O. c. 222, § 222.15(A)(3)(b).  Is it not clear whether asking a passerby to donate when that person declined a solicitation the previous day, or week, would fall within this definition.

83.     The Ordinance is also vague for its prohibition on the sale of an item "for an amount far exceeding its value . . . under circumstances a reasonable person would understand that the purchase is in substance a donation."  This prohibition fails to provide any guidance on what constitutes a price "far exceeding" an item's value.  *Id.* § 222.15(A)(2).  For example, it is impossible to know whether the sale of a street newspaper like "Spare Change" would violate the

Ordinance.  The newspaper sells for one dollar, which is less than the price of most newspapers.

But at the same time some (though not all) people who buy the paper have no intention to read it,

attribute little to no value to it, and intend their purchase solely as a donation.  Likewise, most

understand that amounts given to street musicians are effectively donations, yet the City Council

identified street musicians as individuals who would not be covered by the Ordinance.

84.     Because it places unbridled discretion for enforcement in the hands of the police

and is otherwise vague, the Ordinance infringes Plaintiffs' rights under the First and Fourteenth

Amendments to the United States Constitution and Articles I and XVI of the Massachusetts

Declaration of Rights.

**The Ordinance Discriminates Against the Homeless**

85.     A plain reading of the Ordinance makes clear that C.O.  c.222, § 222.15 is

targeted at the protected speech rights of Lowell's homeless.  While, in theory, "the [Ordinance],

in its majestic equality, forbids the rich as well as poor" from panhandling in downtown Lowell,

the practical effect of the Ordinance cannot be overlooked.

86.     If there were any doubt, the legislative history behind the Ordinance also reveals

the Council's intent to discriminate against the homeless.  The Councilors' discussion focused on

banning panhandling while preserving the ability of fire fighters, mail carriers, other non-profit

organizations, and even street musicians—in other words, everyone other than the homeless—to

solicit donations in downtown Lowell.  Although the City was forced to abandon that explicit

discrimination, the explicit intent to target the homeless was unmistakable.

87.     Further, the Ordinance now specifically provides police officers with discretion in

enforcing the law that still will allow the City to discriminate, with police officers free to order

the homeless to move along at risk of arrest, while allowing all others to continue soliciting.

That the exemption for charities was removed but discretion added in the same amendment was a thoroughly transparent maneuver.

88.     By adopting an ordinance expressly intended to target the homeless, the City has violated Plaintiffs' rights to equal protection under the First and Fourteenth Amendments to the United States Constitution and Articles I and XVI of the Massachusetts Declaration of Rights.

## CLAIMS FOR RELIEF

### Count I
### Violation of 42 U.S.C. § 1983 (C.O.  c.222, § 222.15)

89.     Plaintiffs hereby re-allege Paragraphs 1 through 88 as though fully set forth herein.

90.     42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

91.     The First Amendment to the United States Constitution, as applicable to the States through the Fourteenth Amendment, prohibits the making of any law that "abridg[es] the freedom of speech."  The Fourteenth Amendment also guarantees due process and prohibits States from denying to any person "the equal protection of the laws."

92.     As described above, C.O.  c.222, § 222.15, on its face and as applied to Plaintiffs, unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments, including their rights to freedom of speech and expression, and their rights to due process and equal protection under the law.

93.     The City, through its ordinance C.O.  c.222, § 222.15, also unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments, including their rights to freedom of speech and expression, and their rights to due process and equal protection under the law.

94.     Because the City has acted and threatened to act under the color of state law to deprive Plaintiffs of rights guaranteed by the Constitution and laws of the United States, Plaintiffs may sue and seek relief pursuant to 42 U.S.C. § 1983.

95.     As a result, Plaintiffs are entitled to preliminary and permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other relief as the Court deems just.

**Count II**
**Massachusetts Civil Rights Act, G.L. c. 12, § 11I (C.O.  c.222, § 222.15)**

96.     Plaintiffs hereby re-allege Paragraphs 1 through 95 as though fully set forth herein.

97.     The Massachusetts Civil Rights Act, G.L. c. 12, § 11I, provides that "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages." Section 11H makes it illegal to "interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth."

98.     Article I of the Massachusetts Declaration of Rights states that "[a]ll people are

born free and equal and have certain natural, essential and unalienable rights; among which may

be reckoned the right of enjoying and defending their lives and liberties; that of acquiring,

possessing and protecting property; in fine, that of seeking and obtaining their safety and

happiness."  Article XVI states, unequivocally, that "[t]he right of free speech shall not be

abridged."

99.     As described above, by enacting C.O.  c.222, § 222.15 and threatening

enforcement through its police officers, the City is using threats, intimidation, and coercion to

interfere with or attempt to interfere with Plaintiffs' rights to freedom of speech, due process,

and equal protection as secured by Articles I and XVI of the Massachusetts Declaration of

Rights, and the First and Fourteenth Amendments to the United States Constitution.  In so doing,

the City has violated and continues to violate G.L. c. 12, § 11H.

100.     As a result, Plaintiffs are entitled under G.L. c. 12, § 11I, to preliminary and

permanent injunctive relief, a declaratory judgment, costs and attorney's fees, and such other

relief as the Court deems just.

**Count III**
**Declaratory Judgment (C.O.  c.222, § 222.15)**

101.     Plaintiffs hereby re-allege Paragraphs 1 through 100 as though fully set forth

herein.

102.     28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its

jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may

declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought."

103.     As described above, Plaintiffs allege that C.O.  c.222, § 222.15, as written,

violates the First and Fourteenth Amendments to the United States Constitution, and Articles I

and XVI of the Massachusetts Declaration of Rights.

104.    Upon information and belief, the City will enforce C.O.  c.222, § 222.15.

105.    There is an actual controversy between the parties as to whether C.O.  c.222, § 222.15 is unconstitutional.

106.    Plaintiffs seek a declaration that C.O.  c.222, § 222.15 is unconstitutional and violates Plaintiffs' rights to freedom of speech, due process, and equal protection under the First and Fourteenth Amendments to the United States Constitution, and Articles I and XVI of the Massachusetts Declaration of Rights.

* * * * *

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request the following relief:

a)  A declaratory judgment holding that the challenged ordinance violates the United States Constitution, including the First and Fourteenth Amendments to the Constitution, and the Massachusetts Declaration of Rights, including Articles I and XVI;

b)  A preliminary and permanent injunction prohibiting the City from enforcing the challenged ordinance;

c)  An award to Plaintiffs of costs and attorney's fees; and

d)  Any such other and further relief that this Court deems just and proper.

Respectfully submitted,

RANDY COPLEY, KENNETH MCLAUGHLIN, and
JOSHUA WOOD,

By their attorneys,


/s/ Kevin P. Martin
Kevin P. Martin (BBO# 655222)
Damian W. Wilmot (BBO# 648693)
Robert D. Carroll (BBO# 662736)
GOODWIN PROCTER LLP
53 State Street
Boston, Massachusetts 02109
Tel.:  617.570.1000
Fax.:  617.523.1231
KMartin@goodwinprocter.com
DWilmot@goodwinprocter.com
RCarroll@goodwinprocter.com

Matthew R. Segal (BBO# 654489)
Sarah R. Wunsch (BBO# 548767)
American Civil Liberties Union
  of Massachusetts
211 Congress Street
Boston, Massachusetts 02110
Tel.: 617.482.3170
Fax.: 617.451.0009
MSegal@aclum.org
SWunsch@aclum.org


Dated:   February 5, 2014