## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RANDY COPLEY, KENNETH MCLAUGHLIN, and JOSHUA WOOD,   )<br>  )<br>  )<br>**Plaintiffs,**   )<br>  )<br>v.   )<br>  )<br>CITY OF LOWELL,   )<br>  )<br>**Defendant.**   )<br>  ) | **C.A. 14-10270-DPW** |

### CITY OF LOWELL'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant City of Lowell (the "City"), pursuant to Local Rule 56.1, hereby submits that the following facts are undisputed.

**Tourism and the City of Lowell**

1.      On June 5, 1978 Congress enacted Public Law 95-290, creating the Lowell National Historical Park.  The Act also established a Lowell Historic Preservation District.  Exh. 1, Public Law 95-290.

2.      The Downtown Lowell Historic District was established on December 13, 1983 under state statute.  Exh. 2, Lowell Historic District Act, Chapter 566, Acts of 1983.

3.      The Downtown Lowell Historic District has been estimated to encompass approximately 400 acres.  Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction, ECF No. 3, page 12.

4.      The Act recognizes the "unique historic values of the city of Lowell, the birthplace of the American industrial revolution."  Exh. 2, p. 978.

5.     The City of Lowell occupies 14.2676 square miles or 9131.3 acres. Exhibit 3, Lowell Geographic Statistics. This makes the Lowell Historic District about 4.3% of the City of Lowell.

6.     The following is data compiled by the National Park Service as to the number of visitors to the Lowell National Historic Park annually over the last ten years:

| | |
|---|---|
| 2005 | 722,458 |
| 2006 | 632,234 |
| 2007 | 519,706 |
| 2008 | 574,410 |
| 2009 | 565,960 |
| 2010 | 540,475 |
| 2011 | 520,452 |
| 2012 | 537,551 |
| 2013 | 517,763 |
| 2014 | 514,524 |

Exhibit 4.

7.     For 2014, the National Park Service compiled the following data and estimates with regard to the Lowell National Historic Park:

| | Total visitors | Non-local visitors |
|---|---|---|
| Number of visitors | 514, 524 | 432,200 |
| Visitor spending | | $27,576,800 |
| Jobs | | 413 |
| Labor income | | $15,511,000 |
| Value added | | $24,526,800 |
| Output | | $39,059,500 |

Exhibit 5, 2014 National Park Visitor Spending Effects, Appendix

8.     The City of Lowell has been identified as a "Gateway City" in Massachusetts.  Exh. 6, Gateway City Report.

9.     Significant redevelopment efforts have helped the City's Downtown experience growth since 2000.  Exhibit 7, City of Lowell Master Plan "Sustainable Lowell 2025", p. xxi.

10.     As of 2013, Lowell subsidized 12.6% of all its residential units, above the 10% goal set by state statute.  Exh. 7, p. xxi.

11.     The City's diverse cultural community, comprised of dozens of galleries, museums and other creative organizations, has continued to support the presentation of over 200 annual festivals.  Exh. 7, p. xxii.

12.     These festivals attract over three million visitors to the City each year.  Exh. 7, p. xxii.

13.     Cultural activity has an annual economic impact of $9.5 million each year.  Exh. 7, p. xxii.

14.     One of the City's main objectives in the Master Plan published in 2013 was to promote safe and welcoming neighborhoods.  Exh. 7, p. 6.

15.     Another main objective is to "support vibrant neighborhood business districts that are easily accessible to all residents." Exh. 7, p. 8.

16.     The Master Plan also lists "foster neighborhood level camaraderie, advocacy and resource-sharing" as a main objective.  Exh. 7, p. 11.

17.     Affordable housing and ensuring that all residents have a safe and secure place to call home also features prominently in the City's objectives.  Exh. 7, pp. 21, 32.

18.     The City prioritizes promoting Lowell as a unique urban hub, attracting residents, businesses, visitors and "other stakeholders." Exh. 7, p. 57.

**Panhandling**

19.     From January 1, 2012 to March 31, 2015, the Lowell Police Department received eight-hundred and twenty-seven (827) calls regarding panhandling. Exhibit 8, Computer Aided Dispatch Calls, 1/1/2012 – 3/31/2015. This number is based on the code that the dispatcher labeled the call when it was made. Exhibit 9, Deposition of Superintendent Taylor, p. 91.

3

20.    When a call is made to the police department, the dispatcher writes down a brief narrative, using the caller's words to describe the nature of the problem or incident for which he or she is calling. Exh. 9, pp. 90-91.

21.    In these calls, twenty-three (23) narratives describe the behavior as "harassing." Exh. 8, pp. 13, 33, 56, 61, 68, 72, 75, 76, 85, 93, 110, 123, 127, 135, 136, 145, 146, 152, 168, 174, 189, 191, 203

22.    Eighteen (18) calls involved a panhandler knocking or banging on a car or car windows. Exh. 8, pp. 12, 36, 39, 42, 48, 57, 61, 66, 102, 103, 121, 122, 123, 125, 128, 130, 145, 155.

23.    Forty (40) calls involved panhandlers ignoring a request to leave the premises on which he or she was panhandling. Exh. 8, pp. 13, 29, 49, 49, 51, 53, 58, 58, 64, 69, 73, 73, 75, 76, 84, 87, 87, 103, 104, 110, 113, 115, 131, 133, 134, 136, 138, 139, 140, 148, 154, 158, 159, 172, 176, 179, 182, 197, 199, 199.

24.    In seventy-seven (77) calls, the caller reported that the panhandlers was "bothering", "pestering" or "harassing" customers. Exh. 8, pp. 13, 14, 16, 18, 18, 23, 24, 25, 26, 28, 29, 30, 33, 44, 44, 50, 51, 52, 52, 53, 54, 55, 56, 59, 61, 64, 64, 66, 67, 70, 72, 81, 81, 84, 85, 85, 89, 89, 91, 94, 98, 100, 104, 110, 116, 119, 120, 127, 127, 135, 135, 136, 137, 140, 142, 144, 151, 152, 160, 161, 161, 166, 168, 175, 181, 181, 184, 184, 187, 188, 189, 190, 190, 193, 195, 202, 203.

25.    One-hundred and one (101) calls involved panhandlers in traffic or on highway ramps. Exh. 8, pp. 12, 15, 17, 17, 19, 22, 22, 23, 28, 28, 29, 32, 33, 35, 36, 36, 36, 37, 37, 38, 38, 41, 42, 43, 45, 48, 48, 60, 61, 66, 67, 68, 72, 77, 78, 79, 79, 80, 81, 82, 82, 83, 87, 88, 92, 93, 94, 95, 97, 98, 99, 102, 103, 105, 109, 111, 112, 119, 120, 121, 122, 123, 125, 125, 126, 126, 130, 139, 142, 142, 143, 143, 146, 147, 150, 153, 156, 157, 160, 162, 164, 165, 167, 170, 172, 174, 177, 178, 180, 186, 187, 190, 192, 193, 194, 198, 200, 201, 201, 201, 202.

26.     At least twenty-six (26) calls report panhandling activity at a Target store, or the entrance to the Target plaza.  Exh. 8, pp. 53, 53, 121, 134, 134, 149, 172, 173, 175, 176, 176, 180, 185, 188, 190, 193, 197, 198, 198, 199, 200, 200, 200, 201, 202, 203.

27.     The Target location in Lowell is located at 181 Plain Street, which is outside the Lowell Downtown Historic District.  Exhibit 10, Target Location Map.

28.     Thirty-nine (39) calls were for panhandling in front of a Market Basket or in a Market Basket parking lot.  Exh. 8, pp. 12, 12, 18, 20, 40, 49, 50, 55, 60, 69, 74, 75, 95, 99, 100, 103, 104, 107, 118, 122, 126, 128, 129, 132, 132, 134, 137, 138, 138, 144, 153, 154, 158, 159, 173, 174, 175, 177, 185.

29.     None of the Market Baskets in Lowell are in the Downtown Historic District.  Exhibit 11, Market Basket Map.

30.     In thirty-five (35) of the calls, the panhandler is described as aggressive, threatening, angry, or exhibiting aggressive behavior when refused a donation. Exh. 8 pp. 19, 47, 49, 57, 61, 67, 69, 83, 88, 95, 99, 101, 101, 112, 118, 132, 133, 143, 144, 147, 150, 153, 153, 154, 155, 171, 182, 187, 190, 191, 191, 192, 192, 201, 202.  One caller reported that when he or she refused to donate, the panhandler spat in her face. Exh. 8, p. 49.  In another, the panhandler jumped on the caller's car and licked it. Exh. 8, p. 61.   Other reported behaviors include being threatened, banging on business windows, and a panhandler "put[ting] hands on caller." Exh. 8, pp. 132, 153, 67, 192.

31.     Ninety-six (96) calls involve a panhandler in a parking lot. Exh. 8, pp. 12, 12, 12, 13, 14, 16, 18, 18, 18, 20, 23, 27, 31, 34, 39, 39, 40, 42, 42, 46, 46, 48, 49, 50, 51, 53, 53, 54, 55, 56, 57, 57, 58, 62, 63, 64, 65, 68, 69, 69, 70, 71, 73, 75, 76, 79, 79, 80, 84, 89, 90, 90, 94, 95, 95, 100, 104, 104, 117, 118, 122, 122, 127, 128, 128, 129, 132, 134, 135, 135, 136, 140, 146, 146, 149,

151, 158, 159, 159, 159, 169, 170, 171, 172, 173, 175, 175, 176, 177, 178, 181, 190, 192, 202, 203, 203.

32.     In twelve (12) calls, the caller reports that a panhandler is using a raised voice or is swearing. Exh. 8, pp. 23, 47, 69, 101, 123, 129, 135, 143, 144, 146, 166, 191.  On one occasion, the panhandler was described as "screaming for money" and "getting into people[s] face." Exh. 8 p. 191.

33.     Twenty-two (22) of the calls specifically describe the panhandler as being intoxicated, on drugs or drug-seeking. Exh. 8, pp. 26, 42, 43, 47, 48, 56, 85, 90, 92, 97, 98, 100, 127, 128, 139, 153, 157, 164 166, 177, 188 195.  In one call, the panhandler is reported to be offering sexual favors for alcohol.  Exh. 8, p. 56.  In another, the panhandler was asking passersby if they could spare any pills.  Exh. 8, p. 48.  One business owner called to complain because panhandlers were leaving beer bottles in front of his or her store.  Exh. 8, at 85.

34.     At least nineteen (19) calls involve a panhandler asking for money near a bank or ATM. Exh. 8, pp. 16, 19, 31, 36, 45, 57, 65, 65, 66, 68, 93, 107, 109, 112, 117, 146, 157, 186, 202.  In one of the calls, the panhandler is specifically described as being aggressive with people leaving the ATM. Exh. 8, p. 112.

35.     Seventy-one (71) calls involve panhandlers in a group of two or more people.  Exh. 8, pp. 13, 24, 24, 26, 28, 28, 30, 34, 35, 37, 40, 42, 44, 46, 46, 48, 48, 50, 54, 56, 66, 67, 68, 69, 70, 71, 71, 73, 74, 75, 79, 77, 77, 78, 79, 79, 80, 81, 82, 83, 84, 86, 87, 90, 92, 94, 96, 98, 99, 100, 101, 108, 113, 115, 119, 123, 125, 128, 129,130, 134, 131,154, 156, 158, 160, 161, 166, 183, 185, 187, 188, 193,194.

36.     At least four calls involved panhandlers near the entrance of a restaurant.  Exh. 8, pp. 67, 68, 74, 84.

37.    At least one call involved panhandling inside of a food service establishment.  Exh. 8, p. 114.

38.    Other reported behaviors include following a caller from the ATM, intimidating women, following people to their cars, looking into cars, and shoving a paper cup into a caller's face. Exh. 8, pp. 65, 74, 102 and 107, 106, 78.

39.    Plaintiff Joshua Wood agrees that it is "creepy and weird" to be followed by someone. Exh. 12, Deposition of Plaintiff Joshua Wood, p. 102.

40.    Plaintiff Kenneth McLaughlin, on the other hand, believes that it is okay to walk "along the sides of streets while asking for money," and says that if people become nervous he can, "just back off."  Exhibit 13, Deposition of Plaintiff Kenneth McLaughlin, p. 84.

41.    Plaintiff Joshua Wood has panhandled in a group, with as many as four people.  Exh. 12, p. 119.

42.    Occasionally Wood and his friends will stand on either side of the door of a business. They will ask people coming in and exiting the business for money.  Exh. 12, p. 119.

43.    Occasionally, by accident Wood and his friends will ask someone for money simultaneously.  The person being asked may be startled, but Wood and his friends find it "kind of funny." Exh. 12, p. 120.

44.    On one occasion, Joshua Wood was panhandling with two other people outside of a CVS. As one man was leaving the store, "we all had a laugh about it afterwards, but we all ended up asking him at the same time and I'm sure it might have confused him a bit and he hauled off and punched me on the side of the head and then proceeded to run down the street."  Exh. 12, p. 113.

45.    Plaintiff Kenneth McLaughlin stated that if he is planning on cooking or eating with someone, they will pick different areas to panhandle and pool the money.  Exhibit 13, pp. 82-83.

46.    The Lowell Chamber of Commerce is of the opinion that panhandling negatively affects business in the downtown area.  Exh. 14, Deposition of Danielle McFadden, p. 55.

47.    This opinion was formed through conversations with residents, tourists and businesses. Exh. 14 p. 56.

48.    Sean Lydon, manager of the Washington Savings Bank believes that the bank has lost business because of panhandling outside the bank.  Exh. 15, Deposition of Sean Lydon, p. 54.

49.    One customer, after being panhandled outside of Washington Savings Bank, commented to Lydon that the experience was "just another reason not to come to downtown Lowell."  Exh. 15, pp. 87-88.

50.    Lydon's impression is that when people see someone panhandling, that signals to them that they are in an unsafe area.  Exh. 15, p. 53.

51.    Kenneth Lavallee, head of security at Enterprise Bank, believes that panhandling negatively affects the historic downtown of Lowell.  Exh. 16, Deposition of Kenneth Lavallee, p. 93.

52.    Danielle McFadden, CEO of the Lowell Chamber of Commerce, has received complaints from Lowell residents regarding panhandling in downtown Lowell.  Exh. 14, p. 86.

53.    McFadden remembers a resident leaving her a voicemail complaining about panhandling. The resident said she had called the police and they said they couldn't do anything about it.  The resident didn't know where else to turn, so she called the Chamber of Commerce.  Exh. 14, p. 86.

54.    McFadden and the Chamber of Commerce have received complaints from tourists in regards to panhandling.  Exh. 14, pp. 98-99.

55.    McFadden states people, "don't want to go into a business where there is somebody outside asking them for money." Exh. 14, p. 54.

56.     McFadden and the Chamber of Commerce believe that "panhandling has become rampant in the downtown area and it is affecting business." Exh. 14, p. 55.

57.     McFadden experiences panhandling almost daily.  There is one man in particular who frequently approaches her for money and sometimes states he sees her on TV.  Exh. 14, pp. 39-41.

58.     McFadden states that part of the discomfort of being panhandled is "not knowing if the person who's approaching you could be on drugs or mentally ill…that they could become aggressive…and that they could be desperate." Exh. 14, pp. 90-91.

59.     McFadden states that panhandling has gotten worse, in terms of frequency, in the City in the last few years.  Exh. 14, pp. 87, 103-104.

60.     McFadden states that currently, "you can't go a block without at least a couple of people either loitering or stopping you to ask for money." Exh. 14, p. 97.

61.     Lydon estimates that people panhandle within twenty (20) feet of the bank or in the parking lot about once a week.  Exh. 15, p. 40.

62.     Lydon estimates that the Washington Savings Bank receives about thirty (30) to forty (40) customer complaints about panhandling each year.  Exh. 15, p. 49.

63.     Lydon receives complaints from customers when they have felt threatened. Exh. 15, p. 59.

64.     Washington Savings Bank employs two security guards, whom alternate shifts so that at any one time there is one security guard at the bank.  Exh. 15, pp. 68-69.

65.     A security guard for Washington Savings Bank reported to Lydon that panhandlers at the intersection across from the bank have been observed working in morning and afternoon shifts and then "divvying up" their proceeds in the bank's parking lot.  Exh. 15, p. 86.

66.    Without the security guards, Lydon believes that the incidents of panhandling at the bank would increase.  Exh. 15, p. 90.

67.    Lydon states that customer complaints originate from incidents immediately around the bank and in the parking lot, and that customers feel less threatened when panhandling occurs further away from the bank.  Exh. 15, pp. 51, 48.

68.    Washington Savings Bank has an ATM in a vestibule of the bank.  A couple of feet outside the ATM are bank property, and then it becomes public sidewalk.  Exh. 15, p. 42.

69.    Panhandlers frequently ask for money outside of the Washington Savings ATM.  Exh. 15, p. 41.

70.    Customers complain that they feel threatened when they are walking out the door of the Washington Savings Bank with cash and are approached by someone asking for money.  Exh. 15, p. 48.

71.    The complaints that Lydon or Washington Savings Bank receive regarding panhandling involve the following behavior: customers being followed to their car, panhandlers leaning on their cars in the parking lot, and panhandlers knocking on their car windows.  Exh. 15, p. 52.

72.    In one instance, a customer came back inside Washington Savings Bank because there was a panhandler leaning on her car, and she was with a small child.  A security guard escorted her to her car, where the panhandler did in fact ask them for money.  Exh. 15, p. 84.

73.    Another Washington Savings Bank customer was told to "f-off" when she refused to donate to a panhandler.  Exh. 15, p. 86.

74.    Kenneth Lavallee is the former superintendent of the Lowell Police Department, and is now a Corporate Security Specialist for Enterprise bank.  Exh. 16, p. 29.

75.     Describing a recent incident when he was panhandled, Lavallee said, "I think that this person has asked me for money on multiple occasions, and you – I guess you wonder when they get the message." Exh. 16, p. 54.

76.     Lavallee worries that even the most benign encounter with a panhandler, if he refuses to donate, could escalate.  Exh. 16, p. 58.

77.     In one such experience, Lavallee was walking from his downtown office to another bank. At the intersection of Merrimack and Palmer Streets, he was approached by a man who asked him for money.  As Lavallee continued on his way, the man kept following Lavallee down Merrimack Street.  The panhandler told Lavallee he could not go to a shelter because he had been banned.  Lavallee became concerned for his safety because the panhandler's narrative implied that he had been potentially involved in a violent incident.  The panhandler followed Lavallee even as Lavallee crossed a street.  The interaction lasted a few minutes and made Lavallee concerned for his safety, especially leaving the second bank.  Exh. 16, pp. 94-96.

78.     In Lavallee's opinion, the panhandler in the incident described above was not violating any laws outside the panhandling ordinance. Exh. 16, p. 102.

79.     The 222 Merrimack Street location has an ATM, located inside a vestibule of the bank. Exh. 16, pp. 25, 98.

80.     It is not unusual for people to panhandle within the vicinity of the 222 Merrimack Street location.  Exh. 16, p. 70.

81.     Lavallee estimates that there is panhandling within twenty feet of the downtown location of Enterprise bank (222 Merrimack Street) two or three times a month.  Exh. 16, pp. 64-65.

82.     Lavallee has safety concerns with panhandling within 20 feet of the downtown (222 Merrimack Street) location of Enterprise Bank.  Exh. 16, p. 70.

83.    Lavallee states that panhandling occurs in the bank parking lot of the 222 Merrimack Street location at least weekly.  Exh. 16, p. 77.

84.    Lavallee once witnessed a panhandler kick a door of the bank.  This occurred because a woman employee of the bank was walking into work and had refused the panhandler's request for a donation.  Exh. 16, pp. 71-72.

85.    Employees, especially women, have expressed concerns for their safety to Lavallee when dealing with individuals who panhandling in the bank parking lot.  Exh. 16, p. 78.

86.    There is a security guard assigned to the downtown Lowell branch of Enterprise Bank 222 Merrimack Street on a daily basis.  Exh. 16, p. 32.

87.    One of the main functions of these security guards is to deter panhandling in front of the bank.  Exh. 16, p. 97.

88.    But for the security presence, Lavallee believes there would be considerably more panhandling outside of the bank.  Exh. 16, p. 98.

**Joshua Wood**

89.    Wood states that if you are homeless in Lowell, you can get two meals a day.  Breakfast is served at the Transitional Life Shelter and Pathfinders.  Dinner is available at the Transitional Life Center, Pathfinders and the Presbyterian Church.  Exh. 12, pp. 69-70.

90.    Wood has dozens of relatives in the Lowell area, ranging in relation from mother, brother, sister, cousins, uncles and grandfather.  Exh. 12, pp.  49-50.

**Current Enforcement Options**

91.    Superintendent Taylor testified that many of the problematic behaviors involved in panhandling cannot be easily dealt with by currently existing criminal statutes.  Exh. 9, p. 224. Such behaviors include intimidation and harassment.  Exh. 9, p.  224.

92.     This is especially true when the behavior occurs on public property.  Exh. 9, p. 226.

93.     Superintendent Taylor testified that disorderly conduct charges are ineffective and disfavored because they often lead to litigation.  The charge is subjective, involves too much discretion and often leads to a physical altercation between the individual and the police officers. Exh. 9, pp. 239-240.

94.     Panhandling occurs much more often now than when Superintendent Taylor was a patrol officer. Exh. 9, pp. 34-35.

95.     The police try to increase patrolling around panhandling "hot spots", but these areas change frequently.  Exh. 9, pp. 226-227.

96.     In addition, "hot spots" may be, "displaced to other choke points where people are queued up.  The common theme here is where people are queued up either in a vehicle, pedestrian, going into an ATM where they – they're particularly susceptible to people coming up to them and – and potentially impeding their – their progress."  Exh. 9, p. 227.

97.     Superintendent Taylor believes the rise in panhandling is connected to drug addiction. Panhandlers have indicated to the police that they panhandle to support their drug habit.  Exh. 9, p. 34.

98.     Dealing with frequent panhandling calls is a significant drain on police resources and diminishes the police force's ability to focus on community policing, crime prevention, building trust and answering calls for other life-saving services.  Exh. 9, pp. 215-216.

99.     Superintendent Taylor stated that there is "a real palpable fear in the community…concerning panhandling, aggressive panhandling." Exh. 9, p. 220.

100.    Superintendent Taylor testified that trying to deal with aggressive panhandling through existing laws has led to a situation, "where nobody feels satisfied, everybody is frustrated.  And

it – and there is a fear, and the fear is real.  It – it can be explained that the public feels, and the frustration I've heard it.  I've heard it repetitively from my officers, the political leaders, the citizens, the business owners."  Exh. 9, pp. 221-222.

101.    In describing how the police handle panhandling currently, Superintendent Taylor  stated that officers "don't feel as though there's effective rules that can give them guidance about panhandling."  He continued, "there's some guidance that the officers can use when there's other applicable criminal statutes like assault, larceny, those type of activity.  But many, many, many of these cases fall into the category of harassment and fear to the residents.  That is not easily dealt with with any other criminal statute."  Exh. 9, pp. 223-224.

102.    When the public sees aggressive panhandling techniques, their perception is that the police department is either ineffective or inattentive to the issue.  Exh. 9, p. 160.

103.    This diminishes the public's perception of their local police department.  Exh. 9, p. 160.

104.    When citizens are put into fear in public places, they don't view the police department as an effective purveyor of the public peace.  Exh. 9, p. 161.

105.    The concern about panhandling diminishing the public's perception of the effectiveness of the Police Department was discussed informally with city council members.  Exh. 9, p. 163.

106.    Taylor also hears about the fear of panhandlers and the lack of police response, at community meetings.  Exh. 9, p. 225.

107.    Many of the concerns expressed by citizens revolve around behavior that, "are short of a criminal offense." Exh. 9, p. 238.

108.    Superintendent Taylor believes part of the fear involved in the panhandling interaction is that people may have had a negative experience with an aggressive panhandler before, and this

changes their perception of even passive panhandlers approaching them in the future.  Exh. 9, p. 204.

109.    Superintendent Taylor stated that, "the current state of affairs…cannot continue.  There has to be something, and this ordinance I think is an effective tool that provides some guidance to everybody involved.  It's – whatever we're doing now is not working."  Exh. 9, p. 222.

110.    In the interim, Superintendent Taylor states that the police have also engaged in a dialogue with those in the shelters to try and find out some of the causes of panhandling, but also, "issues around that population in the City."  Exh. 9, p. 225.

**The Ordinance**

111.    The City adopted an ordinance banning panhandling in the Downtown Lowell Historic District on November 12, 2013.    The ordinance included an exemption for 501(c)(3) organizations.  Exhibit 17, City of Lowell Original Ordinance.

112.    On February 4, 2014, the Lowell City Council adopted an amendment to the earlier ordinance so as to add a ban on aggressive panhandling, and to repeal the 501(c)(3) exemption. Exhibit 18, City of Lowell Ordinance Amendment February 4, 2014.

113.    On March 3, 2015, the Lowell City Council adopted an amendment to the panhandling ordinance so as to allow for "the act of passively standing or sitting or performing music, singing or other street performance with a sign or other indication that a donation is being sought, without any vocal request other than in response to an inquiry by another person." Exhibit 19, City of Lowell Ordinance Amendment March 3, 2015.

114.    A corrected copy of the ordinance is included as Exhibit 20.

115.    Mayor Rodney Elliot stated that organizations such as the Salvation Army create less of a nuisance than panhandlers.  Exhibit 21, Deposition of Mayor Rodney Elliot, p. 54.  It is his

understanding that when the Salvation Army asks for donations, they simply ring a bell and stand passively.  Exh. 21, p. 90.

116.    McFadden, who has raised money for the Salvation Army in front of Market Basket, says that the Salvation Army does so with permission from businesses.  Exh. 14, p. 61.  If she speaks while ringing the bell, it is only to say thank you for a donation.  Exh. 14, p. 95.

117.    Superintendent Taylor believes the ordinance strikes a balance among "everybody's rights." Exh. 9, p. 218.

118.    In his meetings with the public, Superintendent Taylor has explained that panhandling can't be eliminated, and it is constitutionally protected to some extent.  He also explains that the City is trying to find an appropriate ordinance that "provides some guidance to everybody involved, all the stakeholders in this issue." Exh. 9, p. 237.

119.    The Police Department prides itself on taking a, "problem-solving approach to panhandling, to all of our chronic issues in the City." Exh. 9, p. 216.

120.    Superintendent Taylor stated "we have to do a better job at problem solving with this issue because clearly everybody is frustrated." Exh. 9, p. 217.

121.    Superintendent Taylor believes that a continuation of the status quo is not an option because nobody is content with the status quo.  "The public's not happy.  The business owners aren't happy.  And to some extent, the people that are engaged in the activity are very unhappy because they don't have a clear understanding of what they can do and what's acceptable and what's not acceptable."  Exh. 9, pp. 218-219.

122.    In Superintendent Taylor's opinion, the ordinance "provides a roadmap for everybody to peacefully coexist and allow everybody to go about what is arguably their constitutionally

protected activity, but also keep the citizens safe, not fearful and allow business to progress in the City." Exh. 9, p. 219.

123.    Superintendent Taylor hopes that enforcement of the panhandling ordinance will be, "much less subjective, a much clearer explanation to all the parties involved of what's acceptable and what's not acceptable, and that we can find a reasonable balance between the rights of all the people involved."  Exh. 9, p. 243.

124.    The Lowell Police Department has not enforced the panhandling ordinance.  Exh. 9, p. 243.

125.    The Lowell Police Department has not received any training on the ordinance.  Exh. 9, p. 243.

126.    Superintendent Taylor said that prior to enforcement, the Police Department would go over the ordinance to make sure they understand the legal definitions involved.  The department would then do training and develop a policy that officers could use when enforcing the ordinance.  Exh. 9, p. 193.

**Panhandling Locations**

127.    Exhibit 22 is a map prepared by the City of Lowell Law Department showing buffer zone locations in downtown Lowell.

128.    Plaintiff Kenneth McLaughlin stated that there are plenty of places to panhandle in the downtown area other than near ATMs or outdoor seating areas.  Exh. 13, p. 80.

129.    McLaughlin states that he panhandles "everywhere" in Lowell.  Exh. 13, p. 67.  More specifically, he panhandles in the Highlands, downtown, in Lowell Center, Belvedere and Centerville.  Exh. 13, p. 67.

130.   McLaughlin also panhandles at the Market Basket on Fletcher Street.  Exh. 12 at 72-73.

He also panhandles at Walgreens and Target.  Exh. 13, p.  70.

131.   The streets frequented by McLaughlin are Plain Street, the VFW Highway, Bridge Street,

Broadway, Merrimack Street, Central Street, Appleton Street and Church Street. Exh. 13, p. 67.

132.   Plaintiff Joshua Wood panhandled at the CVS on Merrimack Street, the 7/11 and the

Walgreens on Chelmsford Street.  Exh. 12, pp. 98, 108-109.

133.   More generally, Wood panhandled on Central Street, Merrimack Street and Chelmsford

Street.  Exh 12, pp. 108-109.

**Battling Homelessness in Lowell**

134.   In 2008, an action plan was put into place to lessen reliance on a shelter system to address

homelessness, and to move to a prevention and housing first plan.  Exhibit 23, City of Lowell

Action Plan to End Homelessness.

135.   To this end, the City produced a fifty-seven (57) page report detailing Lowell's action

plan to end homelessness.  Exh. 23.

136.   The ten year action plan outlined an eight (8) point strategy to combat homelessness in

the City of Lowell.  Exh. 23, p. 5.

137.   The eight points are: prevent homelessness, end individual and street homelessness,

rapidly rehouse families who become homeless and minimize the impact of homelessness on

children, identify at-risk youth and end youth homelessness, ensure that seniors can age in the

community in peace and safety, develop employment and educational assets, and finally

administer and oversee Action Plan, measure progress and evaluate success.  Exh. 23, p. 5.

138.   For each of the strategy points, the report identified the challenges, potentials solutions,

and action steps to be taken.  Exh. 23, pp. 11-45.

139.    Another way the City is trying to reduce homelessness in Lowell is through the seeking and distributing of federal funds. Exhibit 24, City of Lowell Consolidated Plan.

140.    This Consolidated Plan outlines a set of five-year objectives and strategies that the City will pursue through the application of its Community Development Block Grant (CDBG), HOME Investment Partnerships program, Emergency Shelter Grant (ESG), and Housing Opportunities for Persons with AIDS (HOPWA), as well as through participation with local providers in the network that coordinates the community's system of program and service delivery efforts.  Exh. 24, p. 6.

141.    From those grants, $360,000 of the CDBG and $260,000 of the ESG will go to homelessness prevention over the next five years.  Exh. 24, p. 140.

142.    The funds outlined in the Consolidated Plan are targeted for eighty-seven (87) different projects aimed at goals such as affordable housing, preventing homelessness and providing economic opportunities for low and moderate income households.  Exh. 24, pp. 171-215

143.    For example, the City obtained a grant ($13,184) from Hearth Emergency Solutions which is designed to assist those who are homeless or at risk of becoming homeless by helping them connect with or remain in permanent housing. Exh. 24, pp. 172-173.

144.    The City works with the Lowell Housing Authority, which received $70,000 dollars to help prevent homeless with emergency short term assistance. Exh. 24, p. 213.

145.    The International Institute of Lowell received $40,600 for their project to provide homeless support to refugee residents and families.  Exh. 24, p. 213.

146.    The AIDS Action Committee received $90,000 for their program to provide housing opportunities to chronically homeless individuals with HIV/AIDS.  Exh. 24, p.  205.

147.    The House of Hope, Hope Chest received $8,000 to provide internship opportunities to homeless and recently re-housed parents who have little or no job experience.  Exh. 24, p. 193.

148.    Merrimack Valley Food Bank received $10,000 for its Food Distribution Program, which distributes food to soup kitchens, pantries, shelters and other organizations serving low income individuals and families. Exh. 24, p. 197.

149.    The City also seeks to provide services to the homeless population through its own budget.  Exhibit 25, City of Lowell Budget.

150.    For example, the City largely funds the Career Center of Lowell, which provides career services to many people, including low-income and homeless populations.  Exh. 25, pp. IV-152 – IV-155.

151.    The City's Veterans Affairs office issues payments to prevent evictions of veterans whose rental payments are in arrears.  Exh. 25, pp. IV-116 – IV-118.

152.    The City has a Hunger/Homeless Commission, which advises the City Manager on issues pertaining to homelessness and hunger in the City.  The Commission meets every month. http://www.lowellma.gov/citymanager/HungerHomeless/Pages/default.asp



August 28, 2015                          DEFENDANT, CITY OF LOWELL
                                         By Its Attorneys,


                                         /s/ C. Michael Carlson
                                         Christine P. O'Connor, City Solicitor
                                         BBO #567645
                                         C. Michael Carlson, Assistant City Solicitor
                                         BBO #681286
                                         City of Lowell Law Department
                                         375 Merrimack Street, 3rd Floor
                                         Lowell, MA   01852-5909

Tel: 978-674-4050
Fax: 978-453-1510
co'connor@lowellma.gov
mcarlson@lowellma.gov

## CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the foregoing document was filed through the Electronic Case Filing System for filing and electronic service to the registered participants as identified on the Notice of Electronic Filing on August 14, 2015.

/s/ C. Michael Carlson
C. Michael Carlson, Assistant City Solicitor