UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KENNETH MCLAUGHLIN and JOSHUA
WOOD,

          Plaintiffs,

   v.

City of LOWELL,

          Defendant.

Civil Action No. 1:14-cv-10270-DPW

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.   The City's Summary Judgment Motion Relies Principally On Disputed
     Facts ..........................................................................................................................2

II.  The Panhandling Ordinance Is Subject To Strict Scrutiny .....................................4

III. The City Is Not Entitled To Summary Judgment On The Plaintiffs' First
     Amendment Claim. ....................................................................................................8

     A.   If Strict Scrutiny Applies, Plaintiffs, Not The City, Are Entitled To
          Summary Judgment. .......................................................................................8

          1.   The Downtown Panhandling Ban Is Not Supported By A
               Compelling Interest........................................................................... 9

          2.   The City Never Argues That Either Ban Is The "Least
               Restrictive Means" Of Achieving The City's Interests. ............... 11

     B.   The City Has Not Established That The Panhandling Ordinance Is
          Narrowly Tailored To The City's Asserted Interests................................. 11

          1.   The City Has Not Established That The Downtown
               Panhandling Ban Is Narrowly Tailored To Its Asserted
               Interest In Tourism and Business.................................................... 12

          2.   The City Has Not Established That The Aggressive
               Panhandling Ban Is Narrowly Tailored To Its Asserted
               Interest In Public Safety................................................................. 13

IV.  The City Is Not Entitled To Summary Judgment On Plaintiffs' Due
     Process Claim...........................................................................................................16

V.   The City Is Not Entitled To Summary Judgment On Plaintiffs' Equal
     Protection Claim. .....................................................................................................18

CONCLUSION....................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004) ...................................................................................10

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
No. 10-cv-2262, 2015 WL 5178147 (E.D.N.Y. Sept. 3, 2015) ...........................5, 17

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .......................................................................................................18

*City of Cincinnati v. Discovery Network*,
507 U.S. 410 (1993) ...................................................................................................4, 5

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) .....................................................................................................18

*City of Houston v. Hill*,
482 U.S. 451 (1987) .....................................................................................................16

*City of Renton v. Playtime Theaters, Inc.*,
475 U.S. 41 (1986) ..............................................................................................4, 6, 7, 9

*Cutting v. City of Portland*,
__ F.3d __, No. 14-1421 (1st Cir. Sept. 11, 2015)............................................ *passim*

*Desertrain v. City of Los Angeles*,
754 F.3d 1147 (9th Cir. 2014) .....................................................................................16

*Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of Puerto Rico*,
167 F.3d 1 (1st Cir. 1999) ...............................................................................................2

*Gentile v. State Bar of Nev.*,
501 U.S. 1030 (1991) ...................................................................................................16

*Hill v. Colorado*,
530 U.S. 703 (2000) ................................................................................................4, 5, 6

*Islip v. Caviglia*,
73 N.Y.2d 544 (N.Y. 1989) ............................................................................................9

*Kincaid v. City of Fresno*,
No. 06-cv-1445, 2008 WL 2038390 (E.D. Cal. May 12, 2008) ..................................18

*Los Angeles v. Alameda Books, Inc.*,
 535 U.S. 425 (2002) ...................................................................6, 7, 8

*McCuin v. Secretary of Health and Human Services*,
 817 F.2d 161 (1st Cir. 1987) .............................................................18

*McCullen v. Coakley*,
 134 S. Ct. 2518 (2014) ............................................................. *passim*

*Norton v. City of Springfield*,
 __ F.App'x __, 2015 WL 4714073 (7th Cir. Aug. 7, 2015) ..............5, 13

*Planet Aid v. City of St. Johns*,
 782 F.3d 318 (6th Cir. 2015) ..............................................................5

*Reed v. Town of Gilbert*,
 135 S. Ct. 2218 (2015) ............................................................. *passim*

*Reynolds v. Middleton*,
 779 F.3d 222 (4th Cir. 2015) ............................................................11

*Speet v. Schuette*,
 889 F.Supp.2d 969 (W.D. Mich. 2012) ...............................................9

*Thayer v. City of Worcester*,
 135 S. Ct. 2887 (2015) .......................................................................5

*Turner Broadcasting System, Inc. v. FCC*,
 512 U.S. 622 (1994) .........................................................................10

*United States v. Williams*,
 553 U.S. 285 (2008) .....................................................................16, 18

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
 455 U.S. 489 (1982) .........................................................................16

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ...........................................................................8

*Williams-Yulee v. Florida Bar*,
 135 S. Ct. 1656 (2015) ..............................................................5, 6, 15

*Young v. American Mini Theaters, Inc.*,
 427 U.S. 50 (1976) .............................................................................6

# INTRODUCTION

The City's motion for summary judgment does not come close to meeting the burden that the First Amendment imposes on a government attempting to defend a law that, on its face, regulates speech in a content-based manner. Even setting aside recent legal developments—*e.g.*, the Supreme Court's decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)—the City's motion must fail because it relies on factual assertions that have no record support, that are disputed or that are immaterial, such as the musings of counsel concerning a broken "détente" between "antique" panhandlers and the public. In any event, *Reed* and related decisions are the elephant in the room and the City's efforts to avoid this precedent are unavailing. The City's brief is vague as to whether it is addressing strict scrutiny or intermediate scrutiny, s*ee* City's MSJ 13-20,[1] but its ordinance cannot survive either.

The City's inability to meet the applicable strict scrutiny standard already was addressed in Plaintiffs' summary judgment brief. Plaintiffs use this opposition simply to (1) highlight legal and factual errors in the City's cross-motion and (2) address the City's perfunctory arguments with respect to Plaintiffs' due process and equal protection claims.

For the reasons set forth herein, and in Plaintiffs' cross-motion for summary judgment, the City's motion for summary judgment should be denied.

---

[1] "City's MSJ" refers to the Memorandum of Law in Support of City of Lowell's Motion for Summary Judgment (ECF No. 118). "City's SOF" refers to the City of Lowell's Statement of Undisputed Material Facts (ECF No. 119). "Pls.' MSJ" refers to Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 112). "Pls.' SUMF" refers to Plaintiffs' Statement of Undisputed Material Facts (ECF No. 113). "Pls.' SOF Resp." refers to Plaintiffs' Response to City of Lowell's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, filed with this Opposition. "Pls.' Conf. SOF Resp." refers to Plaintiffs' Response to City of Lowell's Statement of Confidential Facts, filed with this Opposition.

# ARGUMENT

## I.     The City's Summary Judgment Motion Relies Principally On Disputed Facts

It is axiomatic that a motion for summary judgment must be based on undisputed facts, established on the basis of admissible evidence in the record.  *Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of Puerto Rico*, 167 F.3d 1, 6-7 (1st Cir. 1999)  It is therefore extraordinary the extent to which the City's arguments rely not on admissible record evidence, but instead on newspaper articles, journal articles, hearsay, and raw assertions by counsel.  Even where the City arguably claims some record basis for its factual assertions, they hardly are undisputed.

Put aside what generously might be excused as rhetorical statements— for which no citations are provided—in the five-page introduction to the City's motion.  And put aside the assertions in the City's "Facts and Figures," from pages 5-7 of its brief, which play only a minor role in the City's subsequent legal arguments.  The City's principal arguments for summary judgment rely on such baseless, unsupported, and largely irrelevant assertions as the following:

- An assertion (City's MSJ 1) that panhandling "attracts the occasionally or ambiguously homeless; those in and out of housing, rehab and jail; modern-day court jesters or buffoons; trouble-makers; those with apparent access to housing, employment and conventional social participation but who choose a more raffish *modus operandi*; alcoholics; and the drug-addicted," for which the only support is a handful of "confidential" allegations concerning the two plaintiffs that are not undisputed (Pls.' Conf. SOF Resp.);

- A claim (City's MSJ 10) that "the Ordinance was motivated by a breakdown of the old détente between the visibly destitute and the public. By contrast with the antique stereotype of the 'homeless' panhandler, the modern panhandler is: (a) not necessarily destitute-looking; (b) not apparently out of her/his wits; and (c), assertive in the extreme, i.e., the reverse of miserable/helpless," an assertion that is not undisputed and not supported by the evidence cited;

- An assertion (City's MSJ 10-11) that "[t]he legislative record here indicates that the City was primarily concerned with the behavior associated with this new, more problematic strain of panhandling," for which the City does not even cite anything in the record;

- Allegations (City's MSJ 13-14) that "the *predominant* effect of modern panhandling, as documented in the City's records, is not one of need but of aggression," and "panhandlers *often* revert to profanity and threats when refused a donation," and "[i]f the business requests that the panhandler(s) leave, they *often* refuse," (emphases added) disputed claims not remotely supported by the sparse record evidence cited;

- An argument (City's MSJ 14) that the term "peaceful solicitation" is "intrinsically oxymoronic," and that "because of the nature of panhandling, the only thing that could fully vacate any element of threat is the activity suggested by the ordinance, namely sign-holding," a quasi-expert opinion for which the City cites nothing; and

- Finally, an assertion (City's MSJ 15-16) that "[p]anhandling threatens the revenue stream connected to tourism." The City complains that "no obvious mechanism for collecting data about the impact of panhandling on tourism" exists, but it provides no support for that *ipse dixit* and dubious (given the amount of panhandling in large tourist cities such as Boston, New York, and Washington, D.C.) assertion, which should be presented by an expert, not a lawyer.

Even if there were a record basis for these sweeping statements, they plainly are not *material* facts, and serve only to highlight the bias inherent in the law's origin and that underlies Plaintiffs' due process and equal protection claims. Thus, what does it matter if those asking for charity on the streets of Lowell are "in and out of housing, rehab and jail," are "modern-day court jesters or buffoons," or are "raffish." The First Amendment does not mean one thing for Lowell's "good citizens" and another for its "undesirables." Nor is it material to the First Amendment right to seek charity whether someone is "destitute-looking," or has "her/his wits." Many of the "factual" assertions in the City's brief are thus nothing but *non sequiturs*.

Compounding the City's failure to take seriously its obligation in moving for summary judgment with respect to factual allegations, the City's legal arguments also rely inappropriately on non-legal sources. For example, the City cites as authority:

- A New York Times article (and only that New York Times article) for the proposition that if *Reed* is read literally, it "might or might not implicate" laws regulating, among other things, "securities disclosures, defamation law, fraud, extortion, [and] child pornography" (City's MSJ 8);

- The website SCOTUSblog for the proposition that *Reed* announced a "brand-new legal theory" (City's MSJ 8), a plainly incorrect proposition in light of *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 428-30 (1993)); and

- Single-Justice concurrences that have never been adopted by any other Justice of the Supreme Court, let alone a majority of the Supreme Court or any other court (City's MSJ 13).

All told, the City appears not to understand the purpose of summary judgment. It is not a political debate in which flights of rhetoric, unsupported factual assertions, and the theories of newspaper columnists are all fair game. It is a technical legal exercise in which material facts must be undisputed and legal precedents matter. For the reasons given herein and in Plaintiffs' cross-motion, applying those legal standards the City is not entitled to summary judgment; Plaintiffs are.

## II.     The Panhandling Ordinance Is Subject To Strict Scrutiny

The City does not contest that the Panhandling Ordinance is content based on its face. Instead, the City argues that the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. 703 (2000), or *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986), will serve to "immunize the City's Ordinance concerning the question of content neutrality." City's MSJ 9. Neither *Hill* nor *Renton*, however, warrant applying the lesser standard of review reserved for content-neutral laws to the Panhandling Ordinance.[2]

---

[2] The Plaintiffs will not address the City's argument, premised on a *New York Times* article, that application of strict scrutiny to all facially content based laws could lead to "considerable jurisprudential turmoil" (City's MSJ 8), except to note that it is doubtful that all laws regulating securities disclosures, defamation, fraud, extortion, child pornography, price-fixing, misleading advertising, professional malpractice and copyright, *inter alia*, could not withstand strict scrutiny considering the compelling government interests at stake.

In light of recent Supreme Court precedent—both *Reed* and *McCullen v. Coakley*, 134 S. Ct. 2518 (2014)—it is unclear whether *Hill* remains good law. Even if it is,[3] it cannot help Lowell to defend its Panhandling Ordinance. The Supreme Court's decision this year in *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015), makes clear that—whatever standard applies to certain categories of speech by both pro-life and pro-choice activists outside abortion clinics—laws singling out charitable solicitation for restriction are subject to strict scrutiny. *Id.* at 1664 ("We [] appl[y] exacting scrutiny to laws restricting the solicitation of contributions to charity, upholding the speech limitations only if they are narrowly tailored to serve a compelling interest."). Thus, it was unsurprising that the Supreme Court invoked *Reed* to vacate the First Circuit's decision that Worcester's anti-solicitation law is content-neutral. *See Thayer v. City of Worcester*, 135 S. Ct. 2887 (2015). Nor is it surprising that other courts (both pre- and post-*Reed*) have found laws calling out solicitation to be content-based. *See Norton v. City of Springfield*, __ F.App'x __, 2015 WL 4714073 (7th Cir. Aug. 7, 2015) (applying *Reed* to correct prior decision and hold that a statute is content-based if it "bar[s] oral requests for money now but not … requests for money later"); *Planet Aid v. City of St. Johns*, 782 F.3d 318, 328-330 (6th Cir. 2015) (applying strict scrutiny to law that regulated charitable solicitation and not other solicitations); *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, No. 10-cv-2262, 2015 WL 5178147, at *13 (E.D.N.Y. Sept. 3, 2015) (holding that ordinance prohibiting roadside solicitation of employment was content-based because it was "addressed to only one type of speech . . . and does not address other types of roadside solicitation or

---

[3] The City's assertion, supported by a mere blog post, that *Reed* announced a "brand-new [legal] theory" is unfounded. The Supreme Court's decision in *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 428-30 (1993), illustrates that *Reed*'s core holding—that laws content based on their face are subject to strict scrutiny, whatever the government's motive—has been employed for decades.

nonsolicitation speech").  Indeed, it would be incongruous to apply strict scrutiny to a law

regulating directional signs as in *Reed*, and not to an Ordinance that restricts "rights so vital to

the maintenance of democratic institutions."  *Williams-Yulee*, 135 S. Ct. at 1665.[4]

The City next argues that *Renton*'s secondary effects doctrine should control, rather than

*Reed*, and suggests that this court must decide whether *Renton*'s reasoning survives *Reed*.  That

argument must fail for any one of three reasons.

First, the secondary-effects doctrine is entirely inapplicable to the Panhandling

Ordinance.  *Renton*'s holding is limited to "*zoning* restriction[s]  ... designed to decrease

secondary effects *and not speech*" of businesses that purvey sexually explicit materials.  *Los*

*Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448-49 (2002) (Kennedy, J., concurring)

(emphasis added); *Renton*, 475 U.S. at 55-56 (Brennan, J., dissenting) (*Renton*'s application "is

limited to cases involving businesses that purvey sexually explicit materials, and thus does not

affect [] holdings in cases involving state regulation of other kinds of speech" (internal citations

omitted)).  Indeed, since its 1976 introduction in *Young v. American Mini Theaters, Inc.*, 427

U.S. 50 (1976), the Supreme Court only has applied the secondary effects doctrine to cases

concerning the zoning of sexually explicit businesses.

---

[4] Even if *Hill* somehow carves out a space from *Reed* that applies to solicitation, it still does not
help the City's Panhandling Ordinance.  *Hill* turned in significant measure on the facial
viewpoint neutrality of the law at issue.  *Hill*, 530 U.S. at 719-20, 723, 734, 735-36 ("The
Colorado statute[] … places no restrictions on—and clearly does not prohibit—either a particular
viewpoint or any subject matter that may be discussed by a speaker.").  In contrast, the
Panhandling Ordinance is not viewpoint neutral because it only restricts solicitations for
donations and not speech advocating against giving to solicitors.  Pls.' SOF Resp. ¶ 122, Exhibits
1, 11.  Another underlying basis of *Hill* was the Court's conclusion that a limited 8-foot buffer
zone "allows the speaker to communicate at a normal conversational distance."  *Hill*, 530 U.S. at
726-27 (internal quotation marks omitted).  The Panhandling Ordinance's prohibition of all
solicitations in a 400 acre area and of "aggressive" solicitations in 20 foot buffer zones does not
allow normal conversation to continue.

Next, the secondary effects doctrine does not apply here because the City's asserted interest in passing the Panhandling Ordinance was to regulate the *direct* effects of panhandling and not secondary effects related to it. *See Renton*, 475 U.S. at 49 (noting the secondary effects doctrine is not applicable where the regulation is aimed at avoiding "dissemination of 'offensive' speech" (quoting *American Mini Theaters*, 427 U.S. at 70-71 & n.34)); *Alameda Books*, 535 U.S. at 445 (Kennedy, J., concurring) ("[A] City may not regulate the secondary effects of speech by suppressing the speech itself."). Indeed, according to the City's brief, the Ordinance is justified because panhandling is "inherently [] assertive and aggressive," akin to a "time-honored stick-up," with "peaceful solicitation" being "intrinsically oxymoronic." City's MSJ 4, 13-14.[5] The City's witness Ms. McFadden, head of the local Chamber of Commerce, testified that "the request for money" is "an inextricable part" of the experience that makes her "uncomfortable" with panhandlers. Pls.' SOF Resp. ¶ 58, Exhibit 5. Because the City's asserted basis for the Panhandling Ordinance is the harm caused by the solicitation itself, the secondary effects doctrine is inapplicable.

Third, the legislative record is devoid of the extensive evidence required to support a law under the secondary effects doctrine. In *Renton* the court emphasized the city's reliance on studies and "detailed findings… that the location of adult theaters has a harmful effect on the area and contribute to neighborhood blight." *Renton*, 475 U.S. at 50-52. In applying the secondary effects doctrine in *Alameda Books*, the Supreme Court explained that

> a municipality can [not] get away with shoddy data or reasoning. The municipality's *evidence* must fairly support the municipality's rationale for its ordinance.

_____

[5] The Plaintiffs do not concede that panhandling has these direct effects. *See* Pls.' SOF Resp. ¶ 58.

535 U.S. at 438 (emphasis added). Here the City has pointed to no studies or detailed findings—and especially no studies or findings that are *undisputed*—regarding the supposed secondary effects of panhandling on tourism, businesses, or public safety. The City's argument that the "impact[s] of panhandling on tourism [are] … common sense" (City's MSJ 16) is refuted by the fact that hardly any other cities, including most American tourist meccas—Boston, New York, Washington, and so on—are attempting to enforce laws akin to the Panhandling Ordinance. *See, e.g.*, Pls.' MSJ 15, 17-19. For these reasons, *Renton*'s reasoning has no bearing on whether the Panhandling Ordinance is valid under the First Amendment.

III.    **The City Is Not Entitled To Summary Judgment On The Plaintiffs' First Amendment Claim.**

The City's First Amendment analysis alternates between strict and intermediate scrutiny, first discussing compelling government interests (City's MSJ 12-16), but then applying the intermediate scrutiny, narrow tailoring analysis from *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), and *McCullen*, both of which reviewed content-neutral laws (City's MSJ 16-19). The City is not entitled to summary judgment under either strict or intermediate scrutiny.

A.    **If Strict Scrutiny Applies, Plaintiffs, Not The City, Are Entitled To Summary Judgment.**

Under strict scrutiny, the Panhandling Ordinance must be the "least restrictive means of achieving a compelling [government] interest." *McCullen*, 134 S. Ct. at 2530. The Downtown Panhandling Ban is not supported by a compelling interest, and the City does not and cannot argue that either of the Panhandling Ordinance's bans is the "least restrictive means" of achieving the City's interests.

### 1. The Downtown Panhandling Ban Is Not Supported By A Compelling Interest.

The City's claim that its interest in promoting business and tourism is compelling is completely devoid of legal or factual support.[6] Plaintiffs explained in their Motion for Summary Judgment that promoting business and tourism—or, as the City now puts it, promoting "economic revitalization" and "combatting urban blight and decline"—is not a compelling government interest. Pls.' MSJ 13-15. In its cross-motion, the City does not identify a single case holding that these asserted interests are compelling, citing only two cases that do not address the issue at all. City's MSJ 15-16. In *Islip v. Caviglia*, 73 N.Y.2d 544 (N.Y. 1989), the New York Court of Appeal applied *Renton* to conclude that a town's use of zoning to displace a pornographic bookstore was content neutral, and thus did not need to be justified by a compelling interest. *Id.* at 551-52. And in *Speet v. Schuette*, 889 F.Supp.2d 969 (W.D. Mich. 2012), the district court simply declined to address whether "protecting businesses and tourism" was compelling because the ordinance, which made it "a crime to beg in a public place," was not narrowly tailored to *any* interest. *Id.* at 976-77.

Recognizing its complete lack of legal support, the City tries to concoct a compelling interest from the record, asserting that the "record is replete with the negative impact of panhandling on downtown businesses." City's MSJ 15. But even a cursory review of the "facts" cited by the City, City's SOF ¶¶ 44-88, shows that the City's characterization of the record is

---

[6] The City of Tampa, in its Answer to a complaint challenging Tampa's similar ban on charitable solicitation in a downtown area, recently conceded that its interest in "promot[ing] tourism and commercial interests in the downtown and Ybor City districts" is "not sufficiently compelling so as to survive strict-scrutiny review," and that Tampa had "no compelling interest" in implementing its ban. *Homeless Helping Homeless, Inc. v. City of Tampa, Fla.*, No. 15-cv-1219 (M.D. Fla.), ECF Nos. 42 ¶¶ 42-43, 45 ¶¶ 42-43 (September 10, 2015). Thus, one of the only other cities to have enacted a law similar to Lowell's agrees that the interests it advances cannot survive strict scrutiny.

absurd. The entirety of the City's support consists of statements made in the June 2015 depositions of Daniel McFadden, CEO of the Lowell Chamber of Commerce; Sean Lydon, a representative of Washington Savings Bank; and Kenneth Lavallee, a representative of Enterprise Bank. City SOF ¶¶ 44-88.[7] Even accepting that 2015 deposition testimony could retroactively create a compelling interest on which the City Council acted in 2013, which is doubtful,[8] the witnesses on which the City relies gave nothing more than anecdotes—many of them hearsay—and generally confirmed that they had no real evidence that panhandling impacted business. For instance:

- Lowell's Chamber of Commerce does not collect complaints regarding panhandling and it has no records of how panhandling supposedly impacts businesses. Pls.' SOF Resp. ¶ 46, Exhibit 5. While Ms. McFadden stated "that panhandling negatively affects business in the downtown area" (City's SOF ¶ 46), her reasoning—that "there's no positive to any business with panhandlers in the area"—is entirely conclusory. Pls.' SOF Resp. ¶ 46, Exhibit 5. This unsupported statement should be given particularly little weight given that neither Ms. McFadden nor the Chamber ever contacted the City Council regarding panhandling or even participated in public hearings on the Ordinance. Pls.' SOF Resp. ¶ 46, Exhibit XX.

- While Mr. Lydon has concerns about the "perception" of panhandling he admits that: (i) he did not stop visiting areas of downtown Lowell where he was solicited; (ii) he is not aware of any customers who have stopped using the Washington Savings Bank due to panhandling; and (ii) no employees have left Washington Savings Bank as a result of panhandling. Pls.' SOF Resp. ¶¶ 48, 62, Exhibit 6.

---

[7] Paragraphs 44-45 of the City's Statement of Facts have no relationship to whether panhandling impacts businesses; Plaintiffs assume these citations were a typographical error.

[8] In assessing the basis for speech restrictions a Court must determine whether the government has "demonstrate[d] that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994). This demonstration requires, at a minimum, that the government have reviewed some *evidence* that harms are occurring. *Id.* at 666 ("[I]n formulating its judgments, [a government must have] … drawn reasonable inferences based on substantial evidence."); *Bourgeois v. Peters*, 387 F.3d 1303, 1322-23 (11th Cir. 2004) ("City [must] actually t[ake a] directive into consideration when drafting its policy [not] invite[] [the Court] to engage in *post hoc* rationalizations of its policy.").

- Like Mr. Lydon, Mr. Lavallee is not aware of any customers who have left Enterprise Bank as a result of panhandling. Further, while Enterprise Bank has a policy of documenting security incidents, no security incident or customer complaint involving panhandling has been documented. Pls.' SOF Resp. ¶ 82, Exhibit 7.

The post-hoc speculation of business owners and their representatives cannot create a compelling government interest that no court ever has recognized before. And it certainly cannot do so on summary judgment.

## 2. The City Never Argues That Either Ban Is The "Least Restrictive Means" Of Achieving The City's Interests.

The City never argues that either the Downtown or Aggressive Panhandling Ban is the "least restrictive means" of achieving the City's asserted interests. For this reason alone the City is not entitled to summary judgment under strict scrutiny. Indeed, for the reasons set forth in Plaintiffs' cross-motion, Plaintiffs are entitled to summary judgment on this basis.

## B. The City Has Not Established That The Panhandling Ordinance Is Narrowly Tailored To The City's Asserted Interests.

Even if intermediate scrutiny somehow applies post-*Reed*, the City has failed to establish with undisputed facts that either of the Panhandling Ordinance's bans is narrowly tailored to the City's asserted interests.

The Supreme Court explained in *McCullen* that a law is not narrowly tailored where the asserted interests could be "readily be addressed through existing local ordinances," or where other states or cities had confronted similar problems through "more targeted means." 134 S. Ct. at 2538-29. Further, a government cannot simply assert that more targeted efforts "do not work" without actually trying to implement them. *Cutting v. City of Portland*, __F.3d__, No. 14-1421, slip op. at 26 (1st Cir. Sept. 11, 2015); *Reynolds v. Middleton*, 779 F.3d 222, 231-32 (4th Cir. 2015) (citing *McCullen*, 134 S. Ct. at 2539-40). The fact that a broader law would be "easier" to enforce than a narrower one is irrelevant: To satisfy narrow tailoring, "the government must

demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540; *see also Cutting*, __F.3d__, slip op. at 26-27.

The City has failed to establish that either the Downtown or Aggressive Panhandling Ban satisfies *McCullen*: existing laws are sufficient to protect the City's interests and other governments promote similar interests with less restrictive alternatives. Further, both Bans apply to significant amount of speech that the City admits it has no interest in regulating.

        **1.**       **The City Has Not Established That The Downtown Panhandling Ban Is Narrowly Tailored To Its Asserted Interest In Tourism and Business.**

The City's only attempt to argue that the Downtown Panhandling Ban is narrowly tailored is its assertion that the current City Council adopted the Downtown Historic District's boundaries from a Massachusetts statute, and that the Massachusetts legislature must have thought that the "City's historic character extends across the downtown district." City's MSJ 16. The City's argument misses the mark entirely. The City provides no evidence that the Massachusetts legislature ever considered whether the Downtown Lowell Historic District— which includes the sidewalks outside City Hall, the District Court House, and Middlesex Community College, together with numerous mundane businesses of the type found in any American city—is a narrowly tailored geographical area for a ban on an entire class of speech. And even if the legislature did somehow reach that conclusion, it would not relieve the City of providing some evidence supporting the legislature's characterization. The City does not provide a shred of evidence—not a single cite to the record—that the City's "historic character" does in fact extend "across the downtown district." Without any such evidence, the City cannot obtain summary judgment.

More fundamentally, even if the Downtown Lowell Historic District happens to perfectly map onto areas encapsulating the City's "historic character," under *McCullen*, and the First Circuit's recent decision in *Cutting*, the Downtown Panhandling Ban is still not narrowly tailored. As explained in more detail in Plaintiffs' Motion for Summary Judgment (at 15-17):

- only a few cities in the country have tried to ban panhandling throughout downtown areas, and those few cities' laws have either been struck down (as in *Norton*) or are currently being challenged (as in Tampa);

- the Downtown Panhandling Ban prohibits solicitation by charitable organizations even though the City's witnesses admitted that the City has no interest in prohibiting such solicitation, Pls.' SUMF ¶ 12, Exhibit 3;

- the Downtown Panhandling Ban criminalizes vocal solicitation even if the solicitation is welcomed by its intended audience; and

- the City has not shown either that peaceful vocal panhandling depresses tourism and business or that laws targeting specific problematic behavior would not be sufficient to promote the City's tourism and business interests.

Under *McCullen* and *Cutting*, these flaws demonstrate that the Downtown Panhandling Ban is not narrowly tailored regardless of its geographic scope. *See* Pls.' MSJ 15-17. Without even addressing these issues, legally or factually, the City cannot possibly be entitled to summary judgment.

> **2.** **The City Has Not Established That The Aggressive Panhandling Ban Is Narrowly Tailored To Its Asserted Interest In Public Safety.**

The City also fails to establish that the Aggressive Panhandling Ban is narrowly tailored to its interest in public safety. The City has not demonstrated that existing laws on the books—disorderly conduct, assault, obstruction of traffic, trespass and so forth—are insufficient to deal with the public safety hazards that the City claims justify the Aggressive Panhandling Ban's restrictions on speech. *See* Pls.' MSJ 19-20. Nor has the City proven that any remaining issues could not adequately be addressed by the much narrower laws adopted by other jurisdictions—laws that do not criminalize passive signholding, or that have much smaller buffer zones around

limited places such as ATMs.  *See* Pls.' MSJ 17-19.  The City also ignores the ways in which the Aggressive Panhandling Ban is both over- and under-inclusive.

The City's attempt to explain why it nevertheless satisfies *McCullen* is woefully inadequate.  First, it cites testimony from Superintendent Taylor that harassment laws are "too difficult," and disorderly conduct laws are "too vague," to enforce.  City's MSJ 18.  The City's preference for banning speech over applying existing laws because banning speech is "easier" is precisely the strategy *McCullen* rejected, and certainly cannot be enough for summary judgment. 134 S. Ct. at 2540; *see also Cutting*, __F.3d__, slip op. at 26-27.  Second, the City makes the entirely unsupported assertion that the buffer zones are narrowly tailored because "[t]wenty feet is not a great deal of distance."  City's MSJ 18.  But that bald assertion does nothing to explain why Lowell needs 20-foot buffer zones around numerous public places when numerous other cities have much smaller buffer zones around many fewer public places.  *See* Pls.' MSJ 17-19. At the very least, the City has not introduced undisputed facts explaining why other cities' laws are not sufficient, which it must do to obtain summary judgment under *McCullen*.[9]

The necessary fit between the City's public safety interest and the Aggressive Panhandling Ban also is not supported by undisputed evidence.  The City completely ignores the evidence that the Ordinance is both over- and under-inclusive.  As described in Plaintiffs' cross-motion, the Aggressive Panhandling Ban regulates significant conduct the City admits it has no interest in regulating, such as charitable solicitation, or did not even intend to regulate, such as

_____

[9] The City notes, citing *Ward*, that under intermediate scrutiny it need not use the "least restrictive" means to achieve its desired ends.  City's MSJ 18.  Even so, under *McCullen* and *Cutting* the City must, at the very least, provide some evidence—or at least explanation—as to why less restrictive means used by other cities would not be effective.  *Cutting*, __F.3d__, slip op. at 26 (holding that ordinance banning speech on medians was not narrowly tailored in part because "the City did not try—or adequately explain why it did not try—other, less speech restrictive means of addressing the safety concerns it identified").

signholding.  Pls.' MSJ 19; *see Cutting*, __F.3d__, slip op. at 22 (ordinance banning speech on median strips not narrowly tailored to public safety interest because "plenty of people engage in expressive activities on median strips that the ordinance would ban but that do not pose the same threat to public safety that the City had identified").  And the Ordinance is suspiciously under-inclusive in that it places no limits on even truly "aggressive" conduct when not accompanied by solicitation.  Thus Greenpeace volunteers may repeatedly pester people to sign petitions when they are standing in line outside a public restroom, sitting at a street-side café, or withdrawing money from an ATM.  But panhandlers—or Salvation Army volunteers—may not ask the same individuals to donate spare change even once.  *See* Pls.' MSJ 20; *Williams-Yulee*, 135 S. Ct. at 1668 (noting that "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint" (citation omitted) (internal quotation marks omitted)).

The City justifies the fit between the Aggressive Panhandling Ban and the City's purported public safety interest solely by identifying, from over 800 police log entries classified as relating to panhandling over a three year period, 249 log entries that involved conduct that would violate the Aggressive Panhandling Ban.  City's MSJ 17.  This is not sufficient on its own to entitle the City to summary judgment.  Most obviously, a law is not narrowly tailored because it covers some real-world conduct the government would like to prohibit; if it were, Massachusetts's buffer-zone law in *McCullen* would have been narrowly tailored because Massachusetts adopted the law to address specific evidence, including videos, of protestors "congregat[ing] near the doors and in the driveways of [abortion] clinics."  134 S. Ct. at 2525-26.  Further, of the incidents the City identifies that would be covered by the Aggressive Panhandling Ban, only approximately *eighteen* clearly would not be covered by existing laws.  Pls.' SOF

Resp. ¶ 19, Exhibit 2 at Tables 3 and 4.  A law banning all solicitation in myriad buffer zones

throughout Lowell cannot be justified by 18 police reports over three years.  At the very least,

the police logs raise numerous disputed issues of fact that preclude summary judgment.  *See* Pls.'

SOF Resp. ¶¶ 19-38.[10]

## IV.    The City Is Not Entitled To Summary Judgment On Plaintiffs' Due Process Claim.

Under the Due Process Clause, a regulation is void for vagueness if it "fails to provide a

person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it

authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553

U.S. 285, 304 (2008).  In the First Amendment context, "a more stringent vagueness test"

applies.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).

Disputes of material fact exist in this case as to both whether the Panhandling Ordinance

encourages "discriminatory enforcement" or provides "fair notice."

There are disputed factual questions concerning whether the Panhandling Ordinance

encourages discriminatory enforcement through the limitless discretion it grants to the police.

The City finds it "unfortunate" that "[t]he term 'discretion' has somehow come into disrepute in

the context of law enforcement."  City's MSJ 21.  But the Supreme Court disagrees, having held

that an ordinance "accord[ed] the police unconstitutional discretion in enforcement" when its

"plain language [was] admittedly violated scores of times daily, yet only some individuals—

those chosen by the police in their unguided discretion—[were] arrested."  *City of Houston v.

Hill*, 482 U.S. 451, 466-67 (1987); *see also Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051

---

[10] The City's argument that the Ordinance allows adequate alternative channels of speech also
depends on disputed factual assertions that preclude summary judgment.  Most importantly, the
City relies heavily on a City-generated map that purports to show all buffer zones in Lowell,
City's MSJ 19-20, but Plaintiffs dispute that all buffer zones are actually represented.  *See* Pls.'
SOF Resp. ¶ 127.

(1991). Other courts have also invalidated laws that raise the specter of "selective enforcement, in which a net can be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of the police and prosecution, although not chargeable in any particular offense." *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1156-57 (9th Cir. 2014) (citation omitted) (internal quotation marks omitted) (holding that a law banning the use of vehicles as living quarters was unconstitutionally vague in part because it had been used to target the homeless); *see also Centro de la Comunidad Hispana*, 2015 WL 5178147, at *18 (finding it no "comfort that the Town's safety officers will use their discretion, or be 'trained' on how to determine whether a person is soliciting employment or attempting to stop a vehicle to solicit employment" in violation of municipal ordinance against soliciting employment, because "[s]uch discretion may surely invite discriminatory enforcement").

The legislative history of the Panhandling Ordinance strongly suggests that the Panhandling Ordinance was drafted specifically to allow such selective enforcement. The Downtown Panhandling Ban originally criminalized solicitation even before a police warning but exempted 501(c)(3) organizations; the Lowell City Counsel only added the police-warning requirement after the City's Law Department instructed the City to remove the 501(c)(3) exemption. Pls.' SUMF ¶¶ 11-12, Exhibits 8, 10; Pls.' SOF Resp. ¶¶ 111-112, Exhibit 8. The City's deposition testimony and statements by City Councilors further suggest that the discretion afforded the police will be used to target disfavored groups. For instance: Mayor Elliott testified that the City has no interest in regulating charitable solicitations, but only panhandlers, Pls.' SUMF ¶ 18; Exhibit 3; Councilor Lorrey, in a City Council meeting, distinguished desirable charitable organizations from those "confronting people" directly, who should be regulated, Pls.' SOF Resp. ¶ 111, Exhibit 8 at 1-2; and Councilor Mercier similarly distinguished "those who

promote themselves through entertainment" from panhandlers, Pls.' SOF Resp. ¶ 111, Exhibit 8 at 3. These statements create a factual dispute concerning the potential for, and intent to engage in, discriminatory enforcement.

Factual questions also exist as to fair notice. The City acknowledges "ambiguities as to various terms within the Ordinance," as well as "potential infelicities" between the Panhandling Ordinance and other City regulations. City's MSJ 21. The City, purporting to cite Superintendent Taylor's deposition testimony, claims that these conceded ambiguities "would be clarified prior to any enforcement." City's MSJ 21. But the Superintendent's deposition testimony states only that the *police* would *internally* "go over the ordinance to make sure they understand the legal definitions involved." City SOF ¶ 126. That testimony does not establish that "a person of ordinary intelligence" in the public would have "fair notice" of the Panhandling Ordinance's requirements. *Williams*, 553 U.S. at 304; *see also City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).[11] Indeed, the Ordinance is sufficiently unclear that the City's Mayor and Rule 30(b)(6) witness misunderstood the Aggressive Panhandling Ban as containing an exemption for signholding. Pls.' SUMF ¶ 17. If the City does not understand the scope of the Ordinance, there is at least a factual question as to whether the public has fair notice.

## V.    The City Is Not Entitled To Summary Judgment On Plaintiffs' Equal Protection Claim.

Under the Equal Protection Clause, a "bare desire to harm a politically unpopular group" is not a "legitimate state interest[]" and cannot satisfy even rational-basis review. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985) (citation omitted) (internal quotation

---

[11] The City is similarly misguided in its citation of *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161, 168 (1st Cir. 1987), a Medicare case with no connection to the vagueness doctrine.

marks and ellipses omitted); *see also Kincaid v. City of Fresno*, No. 06-cv-1445, 2008 WL 2038390, at *10-*11 (E.D. Cal. May 12, 2008) (plaintiffs stated valid Equal Protection claim by alleging that a city adopted a cleanup policy targeting homeless persons' property for immediate destruction to induce the homeless to "move along").  Although the City catalogues measures it has taken to combat homelessness and poverty, City's MSJ 22-23, this evidence at best raises a factual question as to the City's motives in enacting the Panhandling Ordinance.  The City's alleged efforts to alleviate poverty do not preclude the competing inference that the Panhandling Ordinance was adopted to "move along" those homeless persons who the City's brief describes as "modern-day court jesters or buffoons" and "raffish." *Supra* at 2-3.[12]

The Panhandling Ordinance's legislative history amply supports the inference that the Panhandling Ordinance unconstitutionally targets the homeless.  The Panhandling Ordinance was first proposed in response to the City Council's request to develop a plan to prohibit panhandling in Lowell.  Pls.' SUMF ¶ 5.  At the July 2013 meeting at which the City Council made this request, then-Councilor Elliott opined that panhandling "doesn't set a good presence downtown . . . or anywhere else in the city."  Pls.' SUMF Exhibit 6 at 2.  At a subsequent meeting, other City Councilors distinguished between homeless panhandlers on the one hand and charities and entertainers on the other.  *Supra* at 17-18.  The original version of the Panhandling Ordinance tracked this distinction, exempting solicitation by charitable organizations or on behalf of third parties, while criminalizing solicitation by homeless individuals.  Pls.' SUMF ¶ 11.  Although that carve-out was removed on the advice of the City's Law Department, Pls.'

---

[12] *See also, e.g.*, Apr. 14, 2014 Hr'g Tr. at 6:4-7 ("[S]omeone would have had to have fallen off the turnip truck to believe that this is anything other than directed at homeless people in Downtown Lowell."), 26:6-7 (noting "certain comparisons to Anatole France's comment that the rich and poor of Paris are equally able to sleep under the bridges").

SUMF ¶¶ 11-12, Mayor Elliott conceded that the City still has "no interest" in banning solicitation by organized charities and stated that such organizations should be "treated differently" from panhandlers, Pls.' SUMF ¶ 18; Exhibit 3. Police Superintendent Taylor's statement that police officers exercising their discretion to enforce the downtown ban should consider the identity and behavior of a solicitor further suggests that the Panhandling Ordinance will only be—and was only intended to be—enforced against impoverished panhandlers and not against charities such as the Salvation Army. Pls.' SOF Resp. ¶¶ 93, 123, Exhibit 1.

Based on this evidence, there is a genuine dispute of fact as to whether the Panhandling Ordinance was adopted out of an improper motive to discriminate against the homeless.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiffs' Memorandum of Law in support of their own motion for summary judgment, the Court should deny the City's motion for summary judgment and grant summary judgment in favor of the Plaintiffs.

Dated: September 11, 2015

Respectfully submitted,

KENNETH MCLAUGHLIN, and JOSHUA WOOD

By their attorneys,

/s/ Kevin P. Martin
Kevin P. Martin (BBO# 655222)
Robert D. Carroll (BBO# 662736)
Corrine L. Lusic (BBO# 676756)
Goodwin Procter LLP
53 State Street
Boston, Massachusetts 02109
Tel.: 617.570.1000
Fax.: 617.523.1231
KMartin@goodwinprocter.com
RCarroll@goodwinprocter.com
CLusic@goodwinprocter.com

David Zimmer (*pro hac vice*)
Goodwin Procter LLP
Three Embarcadero Center, 24th Flr.
San Francisco, CA 94111
Tel.: 415.733.6006
Fax.: 415.677.9041
DZimmer@goodwinprocter.com

Matthew R. Segal (BBO# 654489)
Sarah R. Wunsch (BBO# 548767)
American Civil Liberties Union
of Massachusetts
211 Congress Street
Boston, Massachusetts 02110
Tel.: 617.482.3170
Fax.: 617.451.0009
MSegal@aclum.org
SWunsch@aclum.org

## CERTIFICATE OF SERVICE

I, Kevin P. Martin, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 11, 2015.

<div style="margin-left: 50%;">

/s/  Kevin P. Martin
Kevin P. Martin

</div>