UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KENNETH MCLAUGHLIN AND        )
JOSHUA WOOD                   )
                             )
        Plaintiffs,          )
                             )    CIVIL ACTION NO.
        v.                   )    14-10270-DPW
                             )
CITY OF LOWELL               )
                             )
        Defendant.           )


MEMORANDUM AND ORDER
October 23, 2015

     The City of Lowell, Massachusetts, considers itself to have
a problem with panhandling.  Many officials, residents, and
local stakeholders have come to believe that panhandling been
becoming more common and that panhandlers have become more
aggressive.  In response, in 2013 the City passed an ordinance,
Lowell Code § 222-15 ("the Ordinance"), to limit panhandling in
the city; the Ordinance has since been amended twice.  As it
currently stands, the Ordinance bans all vocal panhandling in
Lowell's downtown, and bans what are identified as aggressive
panhandling behaviors citywide.  This case presents a challenge
to the Ordinance in the context of evolving case law from the
Supreme Court and the First Circuit.

## I. BACKGROUND

### A. *Factual Background*

Plaintiffs are two[1] homeless men who have panhandled in Lowell, requesting money that they use for, among other things, food, medicine, and shelter.  They have challenged the validity of Lowell's panhandling regulations under the federal Constitution, primarily as violative of their First Amendment right to freedom of speech, but also as violative of the Due Process and Equal Protection clauses of the Fourteenth Amendment.  They wish to continue asking passersby for donations in Lowell's public places and believe they have a constitutional right to do so.

The Ordinance creates two basic categories of restrictions which can be characterized as the Downtown Panhandling provisions and the Aggressive Panhandling provisions.  Both categories share a common definition of panhandling as the solicitation of any item of value through a request for an immediate donation. § 222-15(A).  The sale of an item for an inflated amount, such that a reasonable person would understand

---

[1] A third plaintiff was dismissed from this case in July 2015 after he failed without notice to appear for his deposition and plaintiffs' counsel notified the court they had been unable to reach or communicate with him despite numerous attempts to do so.

it to be in substance a donation, also constitutes panhandling under the Ordinance. *Id.*

The Downtown Panhandling provisions were initially enacted by the Lowell City Council on November 12, 2013.  These provisions ban all panhandling in the Downtown Lowell Historic District, although important exceptions exist. § 222-15(B)(1). As originally enacted, organized charities seeking donations for third parties — most iconically, the Salvation Army — were exempt and permitted to solicit in the Historic District.  This exemption was removed on February 4, 2014; plaintiffs allege that was done in response to the threat of litigation.  On March 3, 2015, a different exemption was inserted in the Downtown provisions, permitting panhandling that involves only "passively" standing, sitting, or performing music.  *Id.*  These passive panhandlers may hold a sign asking for a donation, but may not make any "vocal request" except in response to an inquiry. *Id.*  These restrictions cover an extensive area — some 400 acres – which include some of the most trafficked areas in the City and a number of important government sites.

The Aggressive Panhandling provisions were enacted on Feb. 4, 2014.  These provisions prohibit panhandling "in an aggressive manner." § 222-15(B)(2).  What constitutes "aggressive" panhandling is defined as any of ten activities.

§ 222-15(A)(1)-(10).  These ten activities can be placed into three basic categories.  One category includes provisions that are duplicative of existing sanctions but directed specifically at panhandling.  The first provision criminalizes panhandling that is "intended or likely to cause a reasonable person to fear bodily harm to oneself," harm to another, or property damage. § 222-15(A)(1).  Causing a reasonable person "to fear immediate bodily harm" is assault. *Commonwealth* v. *Gorassi*, 733 N.E.2d 106, 109-10 (Mass. 2000).  Accordingly, this provision creates a new offense of panhandling while committing assault.  The eighth provision defining aggressive panhandling is also substantially identical to assault.  § 222-15(A)(8).  The third provision defining aggressive panhandling as "intentionally touching. . . without that person's consent," § 222-15(a)(8), is simply a restatement of the crime of battery, Mass. Gen. L. ch. 265 § 13A; *Commonwealth* v. *Burke*, 457 N.E.2d 622, 624 (Mass. 1983), with the additional element of panhandling.  The fourth provision, (§222-15(a)(4)), which deems aggressive panhandling that intentionally interferes with the passage of pedestrians or vehicles, appears to be duplicative, as the parties agree, of Lowell ordinances that make it illegal to "occupy or obstruct any sidewalk as to interfere with the convenient use of the same by pedestrians," § 243-20, and that regulate pedestrians entering a roadway, § 266-138.  *See also* 720 C.M.R. 9.09.  The

4

fifth provision, prohibiting panhandling using violent or threatening language or gestures likely to provoke an immediate violent reaction, § 222-15(a)(5), is somewhat distinct, although I will treat it alongside these duplicative provisions because it prohibits "fighting words," a category of speech that largely falls outside the First Amendment's protections. *Chaplinsky* v. *State of New Hampshire*, 315 U.S. 568, 572 (1942) (holding that the Constitution does not protect words which "tend to incite an immediate breach of the peace").

A second category of prohibited panhandling activities includes behaviors not otherwise criminal that Lowell contends are coercive panhandling techniques. There are three such provisions: continuing to panhandle from a person after that person has "given a negative response to such soliciting," § 222-15(A)(2); following a person with the intent of asking for money or things of value, § 222-15(A)(6); and panhandling in a group of two or more, in an "intimidating fashion" § 222-15(A)(9).

In a final category of panhandling activities, Lowell has deemed all panhandling performed in certain locations to be illegal aggressive panhandling. Panhandling from anyone who is waiting in line is banned. § 222-15(A)(7). Additionally, any panhandling within a twenty feet buffer zone around a bank, ATM, check-cashing business, mass transportation facility, public

5

restroom, pay telephone, theater, or outdoor seating area, or
around the parking lot for any of those facilities, is banned.
§ 222-15(A)(10).

There is no passive sign holding exception for the
Aggressive Panhandling provisions; as a consequence, even
sitting and holding a sign asking for donations is prohibited in
these locations.  Originally, the Aggressive Panhandling
provisions only applied in the Downtown Lowell Historic
District, but they were extended citywide on March 3, 2015.

Plaintiffs have regularly panhandled in Lowell, including
in the Downtown Historic District.  Neither considers himself
ever to have panhandled aggressively, although they concede it
is possible that they have panhandled in what are prohibited
locations under the Ordinance.  They have stated that, since the
Ordinance was passed, they have avoided panhandling downtown
because they have been afraid of arrest.  They seek a
declaration that the Lowell panhandling ordinance is
unconstitutional and a permanent injunction against its
enforcement.

**B.   *Procedural History and Standard of Review***

No part of the Ordinance has yet been enforced.  Plaintiffs
filed for a preliminary injunction when filing their complaint
in February, 2014, but their motion for interlocutory injunctive
relief was rendered moot by Lowell's agreement to forbear from

6

enforcement until the case was decided on the merits.
Meanwhile, while governing case law has evolved, the City has
considered refinements to the Ordinance.  The current iteration
of the Ordinance is the one which the City has chosen to defend.
The parties have conducted discovery and have filed cross-
motions for summary judgment regarding the current iteration of
the Ordinance.

Under Rule 56, I may grant summary judgment only if there
is no genuine dispute of material fact and if the undisputed
facts demonstrate that the moving party is entitled to judgment
as a matter of law.  Fed. R. Civ. P. 56(a); *Carmona* v. *Toledo*,
215 F.3d 124, 132 (1st Cir. 2000).  Cross-motions for summary
judgment "do not alter the basic Rule 56 standard." *Adria Int'l
Grp., Inc*. v. *Ferre Dev., Inc*., 241 F.3d 103, 107 (1st Cir.
2001).  Rather, I must assess each motion for summary judgment
independently and "determine whether either of the parties
deserves judgment as a matter of law on facts that are not
disputed." *Id*.  Because this is a facial attack on the
constitutionality of a municipal ordinance, I find no material
factual disputes and am able to decide the case on the basis of
uncontested facts.

## II. ANALYSIS

### A.   *Panhandling as Protected Speech under the First Amendment*

Panhandling, as defined by the Ordinance, is expressive

activity within the scope of the First Amendment.  Solicitations
of money by organized charities are "within the protection of
the First Amendment." *Village of Schaumburg* v. *Citizens for a
Better Environment*, 444 U.S. 620, 632 (1980).  *See also
Williams-Yulee* v. *Florida Bar*, 135 S.Ct. 1656, 1664 (2015) ("We
have applied exacting scrutiny to laws restricting the
solicitation of contributions to charity").  This protection
extends to those soliciting funds on their own behalf.  People
who panhandle "may communicate important political or social
messages in their appeals for money, explaining their conditions
related to veteran status, homelessness, unemployment and
disability, to name a few." *Gresham* v. *Peterson*, 225 F.3d 899,
904 (7th Cir. 2000).  Plainly, a sign reading "Sober," or "Two
children," conveys a message about who is deserving of
charitable support, just as a sign reading "God bless,"
expresses a religious message.

Panhandling is an expressive act regardless of what words,
if any, a panhandler speaks.  Even "the presence of an unkempt
and disheveled person holding out his or her hand or a cup to
receive a donation itself conveys a message of need for support
and assistance." *Loper* v. *New York City Police Dep't*, 999 F.2d
699, 704 (2d Cir. 1993).  Courts have consistently recognized
the protected, expressive nature of panhandling.  *See, e.g.,
Speet* v. *Schuette*, 726 F.3d 867, 875 (6th Cir. 2013) ("begging

8

is a form of solicitation that the First Amendment protects");
*Clatterbuck* v. *City of Charlottesville*, 708 F.3d 549, 553 (4th
Cir. 2013) ("the speech and expressive conduct that comprise
begging merit First Amendment protection"); *Smith* v. *City of
Fort Lauderdale, Fla.*, 177 F.3d 954, 956 (11th Cir. 1999).
Panhandling is not merely a minor, instrumental act of
expression.  In the words of the Massachusetts Supreme Judicial
Court, at stake is "the right to engage fellow human beings with
the hope of receiving aid and compassion." *Benefit* v. *City of
Cambridge*, 679 N.E.2d 184, 190 (Mass. 1997).

Lowell casts its argument that "modern" panhandling lacks
the expressive quality deserving protection in language that
demonstrates the opposite.  The City contends that the
panhandlers of today are not the "lone needy person" whose acts
might "keep the issues of poverty and/or homelessness in the
public eye."  Rather, it claims, they represent a "raucous
alternative culture," both "festive and sinister," engaged in "a
war on the public sentiment."[2]  Whether or not there has been a

---

[2] This language is deployed at the outset in the City's
memorandum of law in support of its motion for summary judgment,
p. 1-4. In addition to demonstrating the expressive value of
panhandling, the City's fervent denunciation of the culture of
panhandling also evidences the City's content-based intent in
enacting the Ordinance.  As demonstrated below, however, I find
the Ordinance to be content-based on its face and do not need to
turn to issues of intent. If required to address intent, I would
easily conclude that the City's prohibition of panhandling was

transformation of the culture of panhandling, the raucous presentation of the visions of alternative cultures in the public sphere is at the heart of the First Amendment. *Cf.* *Schaumburg*, 444 U.S. at 632.   The First Amendment clearly limits how panhandling may be regulated.

**B.    *The Downtown Panhandling Provisions***

    1.    The Downtown Panhandling Ban and Strict Scrutiny

The Downtown Panhandling provisions regulate speech in public fora, where the government's power to regulate speech is most constrained.   Sidewalks and parks, both of which are covered by the Downtown provisions, are quintessential public fora. *Cutting* v. *City of Portland, Me.*, __F.3d__, 2015 WL 5306455, at *2 (1st Cir. Sept. 11, 2015).   In public fora, a regulation is subject to stricter scrutiny if it is content-based than if it is a content-neutral time, place or manner regulation, because a content-based regulation "raises a very serious concern that the government is using its power to tilt public debate in a direction of its choosing." *Id.* at *3.

As explained in the Supreme Court's opinion last term in *Reed* v. *Town of Gilbert, Ariz.*, 135 S.Ct. 2218 (2015), a court must determine whether a law is content-based "on its face," based on whether it "applies to particular speech because of the

_____

specifically intended to restrict the speech and expressive context of begging that is within First Amendment protection.

topic discussed or the idea or message expressed." *Id.* at 2227.
A law "targeted at specific subject matter is content-based even
if it does not discriminate among viewpoints within that subject
matter." *Id.* at 2230.  If a law is content-based on its face, it
is immaterial whether the government had a "benign motive,
content-neutral justification, or 'lack of animus toward the
ideas contained' in the regulated speech." *Id.* at 2228 (citing
*Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 429
(1993)).

The Downtown provisions are plainly content-based under
current Supreme Court guidance.  On its face, the Ordinance
distinguishes solicitations for immediate donations from all
others.  A person could vocally request that passersby in the
Historic District make a donation tomorrow, but not today (a
distinction that may be of great import to someone seeking a
meal and a bed tonight).  He could ask passersby to sign a
petition, but not a check.  The City's definition of panhandling
targets a particular form of expressive speech — the
solicitation of immediate charitable donations — d applies its
regulatory scheme only to that subject matter.

*Reed* makes earlier cases, which had split over what forms
of regulation of panhandling were content-based, of limited

continuing relevance.[3]   The Seventh Circuit recognized this in

litigation concerning a very similar ban on panhandling in the

downtown historic district of Springfield, Illinois.   *Norton* v.

---

[3] *Compare Clatterbuck* v. *City of Charlottesville*, 708 F.3d 549,
556 (4th Cir. 2013) (finding a ban on requests for immediate
donations content-based) with *ISKCON of Potomac, Inc.* v.
*Kennedy*, 61 F.3d 949 (D.C. Cir. 1995) (finding such a ban
content-neutral).   To the extent that *United States* v. *Kokinda*,
497 U.S. 720, 730 (1990) and *International Society for Krishna
Consciousness, Inc.* v. *Lee*, 505 U.S. 672, 678 (1992), involving
limitations on solicitations in *non-public* fora, might have been
thought applicable to this case, they are refined by *Reed*.
Justice Kennedy's concurrence in *Lee* deserves additional
mention, given the City's heavy reliance on it in the briefing
now before me.   Justice Kennedy wrote that a regulation
prohibiting the solicitation of an immediate donation was
constitutional and not content-based, because it prohibited only
conduct rather than expression and because such solicitation
carried with it a "risk of fraud and duress." *Id.* at 704-05.   I
find the Sixth Circuit's decision not to follow this
concurrence, which itself was drafted before *Reed*, persuasive:

> We decline to follow the reasoning in Part II of
> Justice Kennedy's concurrence in Lee for three
> reasons.   First, to the extent that Part II of Justice
> Kennedy's concurrence argues that the "physical
> exchange of money" may be isolated from the act of
> solicitation, it runs contrary to *Schaumburg*'s holding
> that solicitation of charitable donations is
> "characteristically intertwined with informative and
> perhaps persuasive speech[.]" *Schaumburg*, 444 U.S. at
> 632, 100 S.Ct. 826.   *Schaumburg* does not suggest that
> the physical exchange of money may be isolated; it is
> "intertwined" with speech that the First Amendment
> protects.   Second, Part II of Justice Kennedy's
> concurrence is not *Lee*'s holding.   And third, Justice
> Kennedy wrote Part II without another Justice joining
> him.

*Speet* v. *Schuette*, 726 F.3d 867, 876 (2013).   Justice Kennedy's
concurrence in *Lee* was, of course, not binding when written and
has become less persuasive since *Reed*.   It appears at this point
clear that regulations of solicitation which single out the
solicitation of the immediate transfer of funds for charitable
purposes are content-based.

*City of Springfield, Ill.*, 768 F.3d 713 (7th Cir. 2014) *on reh'g*, No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015).[4] Before *Reed*, the court had held that the ban was content-neutral, on the grounds that it did not burden particular ideas or viewpoints.  In the wake of *Reed*, the same panel reversed itself, holding that *Reed* required a finding that the ordinance is content-based on its face.  That outcome is equally applicable here.[5]

---

[4] The Springfield ordinance, like Lowell's, prohibited oral requests for immediate donations of money, while allowing signs requesting money or requests to send money later. *Norton* v. *City of Springfield, Ill.*, 768 F.3d 713, 714 (7th Cir. 2014) *on reh'g*, No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015).

[5] I note, in the wake of *Reed*, the Supreme Court also vacated the First Circuit's decision in *Thayer* v. *City of Worcester*, 755 F.3d 60 (2014), a case concerning an anti-panhandling ordinance in Worcester, Massachusetts.  The First Circuit had found the ordinance to be content-neutral, but the Supreme Court remanded that decision "for further consideration in light of Reed." *Thayer* v. *City of Worcester, Mass.*, 135 S.Ct. 2887 (2015).  This disposition does not necessarily mean *Reed* requires a different outcome, but it does speak to the relevance of *Reed* in a case such as this one.  Such an order summarily granting a petition for *certiorari*, vacating the decisions and remanding the case is not a "final determination on the merits," but rather "simply indicate[s] that, in light of 'intervening developments,' there [is] a 'reasonable probability' that the Court of Appeals would reject a legal premise on which it relied and which may affect the outcome of the litigation." *Tyler* v. *Cain*, 533 U.S. 656, 666 n. 6 (2001) (citing *Henry* v. *Rock Hill*, 376 U.S. 776, 777, (1964) (per curiam) and *Lawrence* v. *Chater*, 516 U.S. 163, 167 (1996) (per curiam)).  Thus, while the Supreme Court's action in *Thayer* does not require me to find that this ordinance is content-based, it does clarify that *Reed*, and not earlier cases concerning the regulation of solicitation, must be the starting point for the inquiry.  As of this date, *Thayer* remains under advisement before Judge Hillman to whom the First Circuit

While *Reed* may prove to refine First Amendment law materially, I find the Ordinance content-based for additional reasons based on other recent Supreme Court precedent.  The Court has held that a regulation is content-based if it requires "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen* v. *Coakley*, 134 S.Ct. 2518, 2531 (2014) (quoting *F.C.C.* v. *League of Women Voters of California*, 468 U.S. 364, 383 (1984)).  This test reinforces the conclusion that Lowell's Downtown panhandling provisions are content-based regulations. Under the provisions, a police officer would have to listen to a person's solicitation and determine whether he was asking for an immediate donation before finding a violation.  Moreover, this inquiry into content would always be necessary.  Even where a person was sitting in the Historic District with a sign reading "Hungry and homeless" and speaking to every stranger who walked by, the police officer would still have to determine whether those conversations were prohibited "vocal request[s]" for money.  Neither a pleasant "good morning" nor an aggressive political diatribe unrelated to a solicitation would be impermissible, while a "please give," or an "I'm a veteran" would be.  The Downtown panhandling provisions are thus content-

---

ordered further remand.  *Thayer* v. *City of Worcester*, No. 13-cv-40057 (D. Mass.) (*see* CM/ECF No. 106, Jul. 14, 2015)

based not only linguistically but also in their invitation to content-based enforcement choices.

As a point of comparison, the First Circuit recently declared a Portland, Maine ordinance banning standing or sitting on median strips to be content-neutral. *Cutting*, 2015 WL 5306455 at *4.  Although that ordinance had only been enforced against panhandlers, *id.* at *1, it was facially content-neutral: no message could be expressed from a median strip, whether a request for money or political advocacy.  While the enforcement of the ordinance may have been content-based, the court found, the statute itself restricted speech "only on the basis of where such speech takes place." *Id.* at *4.  Lowell's ordinance, on its face, goes further and eschews such neutrality; the Ordinance applies only to requests for the immediate donation of money. Unlike the ordinance in *Cutting* (which was nevertheless struck down for violating the First Amendment), Lowell's ordinance is subject to the most searching scrutiny.

Lowell argues that its ordinance can escape being treated as content-based pursuant to the "secondary effects" doctrine. Under this doctrine, zoning ordinances meant to address not the content of adult establishments but effects on crime, property values and other neighborhood characteristics can be evaluated as content-neutral regulations. *City of Los Angeles* v. *Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality opinion)

(O'Connor, J.).  To justify an ordinance on these grounds,
however, a government must provide evidence — something better
than "shoddy data" — demonstrating the effect of the speech
regulation on those secondary effects. *Id.* at 438.  This
doctrine does not justify Lowell's ordinance.  Even putting
aside the issue whether the doctrine applies at all outside the
zoning context, *id.* at 448-49 (Kennedy, J., concurring), Lowell
has not provided the kind of reliable data needed to show that
it is truly targeting secondary effects.  More importantly, it
is at least substantially, if not exclusively, targeting the
content of panhandlers' speech, not any secondary effects that
follow.  *Cf. McCullen*, 134 S.Ct. at 2531-32 ("the Act would not
be content neutral if it were concerned with undesirable effects
that arise from 'the direct impact of speech on its
audience.'").  Although the City floats the idea that
panhandling contributes to a larger decline in police efficacy
and public participation, it provides no meaningful evidence-
based support for that contention.  The City is primarily
concerned with panhandlers' direct behavior: that panhandlers
ask for money in numbers deemed too large, in locations too
sensitive or in manners too aggressive.  The secondary effects
doctrine is entirely inapplicable to the Ordinance.

   2.   <u>No Compelling Interest Supports the Downtown Ban</u>
      Because the Downtown provisions are content-based, they

"must be the least restrictive means of achieving a compelling state interest." *McCullen* v. *Coakley*, 134 S.Ct. 2518, 2530, 189 L. Ed. 2d 502 (2014).[6]  This is an exacting standard.  Content-based regulations are "presumptively invalid," *R.A.V.* v. *City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992), and it is the "rare

---

[6] In *Reed*, Justice Thomas framed the standard for strict scrutiny somewhat differently, as requiring "the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed* v. *Town of Gilbert, Ariz.*, 135 S.Ct. 2218, 2231 (2015).  In *McCullen*, Chief Justice Roberts distinguished the "least restrictive means" standard from the arguably more permissive "narrowly tailored" standard:

> "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests.  Such a regulation, unlike a content-based restriction of speech, need not be the least restrictive or least intrusive means of serving the government's interests.  But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."

*McCullen* v. *Coakley*, 134 S.Ct. 2518, 2535 (2014) (internal citations omitted).  The *McCullen* formulation appears more precise, but *Reed* is chronologically the last word on the subject.  Over the years, the Supreme Court has not always distinguished between the two formulations.  *See, e.g., United States* v. *Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest.  If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative.").  As a consequence, it is not only somewhat unclear which standard governs, but precisely what those standards mean relative to each other.  Nevertheless, *McCullen* appears to lay out the contours of the tiers of scrutiny under the First Amendment.  *See also Cutting* __F.3d__, 2015 WL 5306455 at *3 (1st Cir. 2015) (distinguishing the "least restrictive means" test for strict scrutiny of content-based regulations and the "narrowly tailored" test for content-neutral regulations).

case" in which strict scrutiny is overcome, *Williams-Yulee* v.

*Florida Bar*, 135 S.Ct. 1656, 1665 (2015).

Strict scrutiny analysis of content-based regulation begins

by identifying the compelling interest to which a regulation

must be tailored.  The interests originally pursued by the City

of Lowell when it enacted the Downtown provisions - tourism and

economic development - are set forth in the preamble to the

Ordinance:

> Tourism is one of Lowell's most important economic
> industries; and
> The Downtown Historic District is essential for the
> Lowell tourism experience; and
> The City has a compelling interest in providing a
> safe, pleasant environment and eliminating nuisance
> activity within the Downtown Historic District; and
> Solicitation, begging or panhandling substantially
> burdens tourism within the Downtown Historic District.

Fostering economic revitalization in a challenging

urban area like Lowell is undoubtedly a critical task for

city policymakers and may rise to the level of a

significant, indeed a substantial, government interest

sufficient to justify content-neutral regulations.  *See*

*Smith* v. *City of Fort Lauderdale, Fla.*, 177 F.3d 954, 956

(11th Cir. 1999) (promoting tourism and providing a "safe,

pleasant environment" conceded by parties to be significant

government interests); *Edwards* v. *D.C.*, 755 F.3d 996, 1002-

03 (D.C. Cir. 2014) (the protection of the tourism industry

is "undoubtedly" a "substantial government interest").  A

vibrant downtown economy can help provide jobs to the

unemployed, reduce crime and improve public safety, and

provide tax revenue for essential public services,

including those that help the homeless and other

panhandlers.[7]

However, the promotion of tourism and business has never

been found to be a compelling government interest for the

purposes of the First Amendment.  *See Pottinger* v. *City of

Miami*, 810 F. Supp. 1551, 1581 (S.D. Fla. 1992) ("the City's

interest in promoting tourism and business and in developing the

downtown area are at most substantial, rather than compelling,

---

[7] Plaintiffs assert that the City failed to establish that
panhandling actually harmed business or tourism downtown,
arguing that the City's evidence amounts to anecdotes and
hearsay.  The City bears the burden of showing that the harms it
seeks to mitigate "are real, not merely conjectural, and that
the regulation will in fact alleviate these harms in a direct
and material way." *Asociacion de Educacion Privada de Puerto
Rico, Inc.* v. *Garcia-Padilla*, 490 F.3d 1, 18 (1st Cir. 2007)
(quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 644
(1994) (plurality opinion)).  In this regard, the courts owe
"substantial deference" to a legislature's predictions about the
effect of its policies, given its institutional capacity to
gather information and the fact that it is not obligated to
prepare that information into record form. *Turner Broad. Sys.*,
512 U.S. at 665-66.  At the summary judgment stage, I would be
hesitant to hold that the legislature lacked a sufficient basis
to believe that panhandling was impeding the downtown economy,
even without rigorous data collection or analysis, where it
conducted a public hearing and heard from stakeholders.  In any
event, because I hold that tourism and business promotion are
not compelling government interests, I do not need to decide
definitively the issue whether the evidence supporting harm to
business or tourism downtown by panhandling is sufficient.

interests"). I cannot conclude that tourism promotion is a sufficiently important interest to allow content-based restrictions on speech affecting it to survive strict scrutiny. Such a conclusion would permit a highly open textured and inadequately developed justification to eviscerate limitations on content-based speech regulation.[8]

The mechanism by which Lowell's ban on panhandling downtown would promote tourism flies in the face of the First Amendment. The First Amendment does not permit a city to cater to the preference of one group, in this case tourists or downtown shoppers, to avoid the expressive acts of others, in this case

---

[8] Even if the promotion of business and tourism were a compelling government interest, the Downtown provisions are hardly the least restrictive means of promoting them. The restrictions have a large geographic sweep, covering essentially all of downtown Lowell, including the most trafficked areas where panhandlers could reach the most people. *See Cutting* 2015 WL 5306455, at *6 (noting that the challenged ordinance encompassed a large number of spaces, including those that were most useful for plaintiffs' speech). And they flatly ban all vocal requests for money. *See Frisby* v. *Schultz*, 487 U.S. 474, 485 (1988) ("A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil."). I do not reach the issue of tailoring because I conclude there is no compelling interest against which the Downtown Panhandling provisions are to be measured. Nevertheless, it is apparent that the challenge of establishing a broad undifferentiated geographic (except for the label "Historic District") prohibition as the least restrictive means available would be an all but insurmountable hurdle for the City. Moreover, as the discussion in section II.C. of the Aggressive Panhandling provisions makes clear, the City has not surmounted that hurdle with its more narrowly defined approach to aggressive panhandling.

panhandlers, simply on the basis that the privileged group does not like what is being expressed.  It is core First Amendment teaching that on streets and sidewalks a person might be "confronted with an uncomfortable message" that they cannot avoid; this "is a virtue, not a vice." *McCullen*, 134 S.Ct. at 2529.  Just as speech cannot be burdened "because it might offend a hostile mob," *Forsyth Cnty., Ga*. v. *Nationalist Movement*, 505 U.S. 123, 135 (1992), it cannot be burdened because it would discomfort comparatively more comfortable segments of society.

For First Amendment purposes, economic revitalization might be important, but it does not allow the sensibilities of some to trump the speech rights of others.  *See also Roulette* v. *City of Seattle,* 97 F.3d 300, 308-09 (9th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (Sept. 17, 1996) (Pregerson, J., dissenting) ("Seattle seeks economic preservation by ridding itself of social undesirables… a less than compelling governmental interest"); *Am. Civil Liberties Union of Idaho, Inc*. v. *City of Boise*, 998 F. Supp. 2d 908, 917 (D. Idaho 2014) ("Business owners and residents simply not liking panhandlers in acknowledged public areas does not rise to a significant governmental interest."); *Benefit* v. *City of Cambridge*, 679 N.E.2d at 190 ("A listener's annoyance or offense at a

particular type of communicative activity does not provide a basis for a law burdening that activity").

The City also suggests that the Downtown provisions serve the compelling government interest of public safety, arguing both that promoting public safety is an independent purpose of the Ordinance and that it is a mechanism by which the Ordinance promotes tourism and business.  Plaintiffs do not contest that protecting public safety and preventing coercion are compelling government interests.  However, public safety serves as a post-hoc rationalization for the Downtown provisions. The purpose of the ordinance was authoritatively set forth in its preamble, quoted above, which was duly enacted by the City Council along with the Ordinance.  It is undisputed that only tourism and nuisance abatement (with a passing reference to an associated "safe" environment) were included in that original preamble.

There is a dispute between the parties whether later depositions established public safety as an additional reason for the Ordinance.  That dispute, however, is immaterial, because after-the-fact explanations cannot help a law survive strict scrutiny.  This principle is firmly established for strict and even intermediate scrutiny under the Equal Protection Clause. *Shaw* v. *Hunt*, 517 U.S. 899, 908 n.4 (U.S. 1996) (For strict scrutiny on the basis of racial classifications, "[t]o be a compelling interest, the State must show that the alleged

objective was the legislature's 'actual purpose' for the discriminatory classification, and the legislature must have had a strong basis in evidence to support that justification.") (internal citations omitted); *United States* v. *Virginia*, 518 U.S. 515, 533 (1996) (For intermediate scrutiny on the basis of gender, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation.").  The principle has also been extended to the First Amendment context. *Russell* v. *Lundergan-Grimes*, 784 F.3d 1037, 1052 (6th Cir. 2015); *see also Yellowbear* v. *Lampert,* 741 F.3d 48, 59 (10th Cir. 2014) (in RLUIPA context, where Congress "borrowed its language from First Amendment cases" applying strict scrutiny, "post-hoc rationalizations" cannot prove a compelling interest). The City, having officially put forward its reasons for the Downtown Panhandling provisions, cannot add to those reasons in litigation.  The Downtown Panhandling provisions were passed to promote tourism, not public safety as such, and consequently do not further a compelling state interest.[9]  They therefore cannot survive strict scrutiny under the First Amendment.

---

[9] Even if public safety were a reason for the Downtown Panhandling provisions, strict scrutiny still would not be satisfied.  The Downtown panhandling provisions are not close to the least restrictive means necessary to promote public safety— likely because they were never intended to serve that purpose. The Downtown Panhandling provisions ban all vocal requests for money, regardless of whether they are aggressive or not.  A Salvation Army member who briefly stopped ringing his bell and

23

*C.*   ***Aggressive Panhandling***

  1.   The Aggressive Panhandling Ban and Strict Scrutiny

    The Aggressive Panhandling provisions are governed by the
same First Amendment framework as are the Downtown Panhandling
provisions.   The Aggressive Panhandling provisions regulate
expressive conduct that is protected by the First Amendment.   An
aggressive, perhaps disconcerting and indeed frightening,
panhandler still conveys messages related to need and
deprivation or, in the City's characterization, about the
alternative lifestyle of panhandling.   And as with the Downtown
provisions, these are content-based regulations of activity in
public fora.   The same definition of "panhandling" is employed
in both, regulating only requests for immediate donations.   As
noted in the discussion of the Downtown Panhandling provisions
in Section II.B. above, this definition, on its face,
distinguishes between some solicitations and others based on the
content of that solicitation.   A person following someone to ask

---

instead asked for money verbally would be violating the Downtown
Panhandling provisions, as would a panhandler who never raised
her voice or lifted a hand.   An ordinance which prohibits these
people from soliciting donations, although they pose no
recognized threat to public safety, is not narrowly tailored to
the goal of public safety, much less the least restrictive means
available to achieve that goal.   Indeed, the subsequent
enactment of the Aggressive Panhandling provisions clearly
illustrates the mismatch between the Downtown Panhandling
provisions and any public safety objectives: when concerned
about public safety, Lowell addressed entirely different
behaviors.

for a donation would be treated as illegally panhandling under

the Aggressive Panhandling provisions, whereas someone following

another asking for a petition signature would be permitted to

continue exercising such a right to political expression.  As

content-based regulation, the Aggressive Panhandling provisions

must be the least restrictive means for achieving a compelling

state interest.

Unlike the Downtown Panhandling provisions, however, the

Aggressive Panhandling provisions were enacted in furtherance of

a compelling state interest: public safety.  Plaintiffs do not

contest that preventing "truly aggressive behavior," such as

unwanted touching, is a compelling interest.  Nor could they:

public safety is "the heart of government's function." *Houston

Chronicle Pub. Co.* v. *City of League City, Tex.*, 488 F.3d 613,

622 (5th Cir. 2007).  Given the existence of a compelling state

interest, the question is whether the Aggressive Panhandling

provisions are properly fashioned.

Plaintiffs offer a number of arguments as to why the

Aggressive Panhandling provisions are not the least restrictive

means available for achieving the goal of public safety.  I

address at the threshold one which applies to the provisions

generally.  Plaintiffs assert that Lowell has failed to try a

less speech-restrictive alternative — better enforcing existing

laws, such as disorderly conduct or assault — before enacting

the Aggressive Panhandling Ordinances.  Under *McCullen*, the justification for a restriction on speech cannot simply allege without evidence that other approaches "do not work," nor is it enough to say that a speech restriction would be easier to enforce. *McCullen*, 134 S.Ct. at 2539-40.  Plaintiffs accordingly argue that the City needs to show the failure of a stepped-up approach to the enforcement of existing laws before it could constitutionally enact an anti-panhandling ordinance.

*McCullen*, however, does not require Lowell to have exhausted every enforcement strategy and demonstrated failure before passing the Ordinance.  Rather, the City must "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government interests." *Id*. at 2540.  They may accomplish this either by trying or "adequately explain[ing] why it did not try" alternative approaches, *Cutting*, 2015 WL 5306455, at *9.  In *McCullen*, the Court noted that Massachusetts had not identified a single prosecution brought under alternative laws in 17 years or any injunction issued since the 1990s.  *McCullen*, 134 S.Ct. at 2539. Here, in contrast, plaintiffs concede that the Lowell Police Department responded to 827 calls coded as related to "panhandling/begging" over a period of three years and three months, applying existing laws in each case.  While plaintiffs contest which of these calls actually concerned panhandling or

26

actually required additional enforcement tools,[10] it is clear

that the City, unlike the authorities in *McCullen*, has attempted

to use existing enforcement techniques and yet still plausibly

contends that it has a public safety problem.   In *Cutting*, the

First Circuit responded to the city's claim that existing laws

were inadequate not by requiring additional enforcement, but by

suggesting more targeted forms of new legislation. *Cutting*, 2015

WL 5306455, at *9-10.   Lowell is free to try new approaches to

protecting public safety, including by passing an ordinance

prohibiting aggressive panhandling, so long as that ordinance

satisfies the requirements of the First Amendment.   I turn to

the ten forms of "aggressive panhandling" it has to date

identified to determine whether any or all can survive strict

scrutiny.

   I begin with the duplicative provisions of the definition

of aggressive panhandling, and in particular with the ban on

panhandling while using fighting words, § 222-15(A)(5).   That

provision is unconstitutional under the express holding of

*R.A.V.* v. *City of St. Paul, Minn.*, 505 U.S. 377 (1992).   There,

the Court considered a hate crimes ordinance which prohibited

---

[10] Plaintiffs contend that only 18 out of 827 phone calls could
not be covered by existing laws and that therefore the
Aggressive Panhandling provisions are an overreaction to a very
small public safety problem.   I simply note these numbers are
contested without finding it necessary to resolve the dispute
with precision.

the display of a symbol that amounted to fighting words and
which incited violence on the basis of race, religion, or
gender. *Id.* at 380-81.  Although fighting words themselves are
not protected by the First Amendment, *Chaplinsky*, 315 U.S. at
572, the Court nevertheless found the ordinance in question
violated the First Amendment.  As the Court explained, a
municipality's power to ban speech "on the basis of *one* content
element (*e.g.*, obscenity) does not entail the power to proscribe
it on the basis of *other* content elements." *R.A.V.,* 505 U.S. at
386.  By banning only certain fighting words, on the basis of a
separate form of content-based discrimination, the ordinance
unconstitutionally "impose[d] special prohibitions on those
speakers who express views on disfavored subjects." *Id.* at 391.
So too, here.  The City unquestionably has the power to regulate
fighting words, but it may not create a special ban on fighting
words uttered in connection with the protected speech of
panhandling.  "Selectivity of this sort creates the
possibility," indeed, more than a mere possibility in the case
of Lowell's ordinance, "that the city is seeking to handicap the
expression of particular ideas." *Id.* at 394.

     The reasoning of *R.A.V.* extends beyond its direct
application to fighting words and governs the other duplicative
provisions, see § 222-15(A)(1),(3),(4),(8).  Like panhandling
banned under the Ordinance because it is also an assault or a

battery, the behavior at issue in *R.A.V.* could have been
punished under other, generally applicable criminal laws. *Id.* at
379-80.  *R.A.V.* instructs that where a law prohibits behavior on
the basis of expressive content – even if the underlying
behavior may be prohibited constitutionally or already is
prohibited – the decision to create an *additional* content-based
prohibition must satisfy strict scrutiny. *Id.* at 395-96
(identifying as "dispositive" whether "content discrimination"
is necessary to achieve the city's interests).  The Ordinance
gives Lowell law enforcement officials the option to seek an
additional penalty on a panhandler who commits assault or
obstructs the sidewalk, one which might be exercised in addition
to existing laws or instead of them.  It subjects those who
assault while engaged in particular expressive acts to increased
liability, whether in the form of stacked penalties or more
flexibility, and hence more negotiating leverage, for law
enforcement officials in their charging decisions.

     The City has not demonstrated that public safety requires
harsher punishments for panhandlers than others who commit
assault or battery or other crimes.  To the contrary, in its
briefing the City justified these duplicative provisions on the
grounds that they provide "a useful clarifying function for both
the public and panhandlers," and serve a "hortatory function."
*R.A.V.* specifically rejected such communicative justifications

for content-specific criminal laws.  The Court there addressed

St. Paul's argument that "displaying the city council's special

hostility" to the speech "singled out" could justify that

ordinance, observing "[t]hat is precisely what the First

Amendment forbids." *Id.* at 396.  The City may not deem criminal

activity worse because it is conducted in combination with

protected speech, and it certainly may not do so in order to

send a message of public disapproval of that speech on content

based grounds.

Next, I turn to the second category of actions that the

Ordinance deems aggressive panhandling: those that constitute

non-criminal, allegedly coercive behaviors.  Specifically, these

are continuing to panhandle from an individual who has already

given a negative response to solicitations, § 222-15(A)(2),

following a person with the intent of asking them for money, §

222-15(A)(6), and panhandling in a group of two or more in an

"intimidating" manner, § 222-15(A)(9).

The bans on following a person and panhandling after a

person has given a negative response are not the least

restrictive means available, for similar reasons.  A panhandler

who asks for change from a passerby might, after a rejection,

seek to explain that the change is needed because she is

unemployed or state that she will use it to buy food.  These

additional post-rejection messages do not necessarily threaten

public safety; their explanations of the nature of poverty sit at the heart of what makes panhandling protected expressive conduct in the first place.  Likewise, a panhandler might follow someone in order to convey a longer message.  Both behaviors might be utilized where a promising target – someone who might want to hear a panhandler's message - walks by a panhandler without noticing him at all.  If panhandling is truly valuable expressive speech, then panhandlers may have a right to more than one shot at getting their message across.

Of course, a panhandler who refuses to leave someone alone after a clear rejection and who then follows that person over a great distance, perhaps to their car or past less-trafficked alleyways, might be a very real threat to public safety.  But a less restrictive ordinance could target such threatening behaviors.  Without suggesting that such approaches would in fact pass constitutional muster, *see Cutting* 2015 WL 5306455, at *10 n. 14, I note that an ordinance could give panhandlers some period of time or distance to follow people; it could require multiple or unequivocal statements that a person will specifically not donate rather than a mere "negative response;" or it could add a requirement that the behavior be intended to and, in fact, does harass or be perceived by a reasonable person as harassing.  Other less restrictive means may also be available.  In any event, giving panhandlers only one chance to

31

convey their message, without following or following-up, is more restrictive than necessary.  Defining these two behaviors as illegal aggressive panhandling fails to satisfy the least restrictive tailoring requirements of strict scrutiny of content-based regulations.

As for the prohibition on panhandling in a group of two or more in an intimidating manner, § 222-5(A)(9), it is difficult to know even what it is that is proscribed; "intimidating" is left undefined.  Perhaps the most plausible limiting interpretation of this provision is that "intimidating" group panhandling is that which rises to the level of assault, disorderly conduct, or some other conventionally illegal activity.  Under this interpretation, however, the analysis concerning duplicative provisions, as developed above, governs and a ban would violate the First Amendment.  An alternative interpretation in which "intimidating" was not merely duplicative would restrict more speech and require a stronger justification still.

Moreover, under any definition of "intimidating," this provision singles out for punishment expression conducted by multiple people rather than alone.  Burdening the expression of those who join their voices together infringes upon not only the First Amendment's protection of speech, but also of assembly. *Coates* v. *City of Cincinnati*, 402 U.S. 611, 615 (1971)

(ordinance that prohibited three or more people assembling and behaving in "a manner annoying to persons passing by" unconstitutional due to vagueness, but also because it "violates the constitutional right of free assembly and association.").[11] Just as a city could not tell a pair of Mormon missionaries that

---

[11] As the reference to *Coates* demonstrates, this provision — like others in the Ordinance — raises serious due process concerns. A statute is void for vagueness and violates the Due Process Clause of the Constitution if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States* v. *Williams*, 553 U.S. 285, 304 (2008).  Where expression protected by the First Amendment might be limited, there is a heightened requirement for specificity. *Smith* v. *Goguen*, 415 U.S. 566, 573 (1974). While many of the Lowell Aggressive Panhandling provisions appear adequately defined, some are worrisomely vague, none more so than the prohibition on groups panhandling in an "intimidating" manner.  Moreover, the history of the Ordinance raises the specter of discriminatory enforcement stilling or chilling the voices of homeless panhandlers, as opposed to organized charities.

  Nevertheless, I recognize that the void-for-vagueness doctrine is notoriously ill-defined. *See The Void-for-Vagueness Doctrine In the Supreme Court,* 109 U. PA. L. REV. 67, 70 (1960) ("What gives these decisions their pool-rack-hung-up appearance is their almost habitual lack of informing reasoning"); John Calvin Jeffries, Jr., *Legality, Vagueness, and the Construction of Penal Statutes*, 71 VA. L. REV. 189, 196 (1985) ("there is no yardstick of impermissible indeterminacy").  Courts have often let quite poorly-defined criminal statutes stand, although the vagueness doctrine has been applied with special force to "street-cleaning" ordinances that regulate loitering and disorderly conduct. *See* Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing*, 97 COLUM. L. REV. 551, 610-11 (1997).  *See, e.g., Papachristou* v. *City of Jacksonville,* 405 U.S. 156 (1972) (vagrancy); *Kolender* v. *Lawson*, 461 U.S. 352 (1983) (loitering). Because I hold that the Ordinance in its several challenged dimensions violates the First Amendment, I do not need to reach this difficult due process issue.

they must knock on doors alone (much less tell only missionaries but not other door-to-door solicitors to work alone), Lowell may not forbid panhandlers whose activity is otherwise permissible from expressing themselves together without satisfying strict scrutiny.  In the absence of record evidence that panhandling in a group of two or more is a greater threat to public safety than panhandling alone — or that "intimidating" group panhandling is more dangerous than "intimidating" solo panhandling — such scrutiny cannot be satisfied.

The third category of "aggressive panhandling" provisions defines all panhandling in certain locations as aggressive and therefore prohibited.  Panhandling from anyone waiting in line is considered aggressive.  § 222-15(A)(7).  Also prohibited is all panhandling within a 20 foot buffer zone surrounding the following locations: a bank, an ATM, a check-cashing business, a transit stop, a public restroom, a pay telephone, a theater, or any outdoor seating, as well as any parking area associated with these facilities.  § 222-15(A)(10).  In delineating these locations as closed off for panhandling, the City fails to use the least restrictive means available for protecting public safety.  The locations where the City has prohibited panhandling are divided between those, like a bus stop or a line, where people are essentially captive audiences for panhandlers, and those, like near ATMs or public restrooms, where there is an

elevated risk or fear of physical harm.  The first set is not
tailored to public safety at all; while it may be more
bothersome, and even in some sense more coercive, for a person
to be panhandled when they cannot, or find it difficult to
leave, it is not demonstrably more dangerous.[12]

In contrast, those at a public restroom or in a parking lot
might reasonably feel particularly vulnerable physically and
those withdrawing money from an ATM might be at higher risk of
being robbed or threatened.  Restricting panhandling in those
locations might satisfy the narrow tailoring requirement for
content-neutral regulations. *See, e.g.*, *Gresham*, 225 F.3d at
906.  Yet they are not the least restrictive means available to
protect public safety.  It is undisputed that these provisions
prevent any solicitation of funds in these locations, even the
silent and passive holding of a sign.  And while the City claims
that the choice to hold a sign near an ATM is "however slightly,
a kind of provocation," it presents no meaningful argument and
no record evidence to support that claim.  The Aggressive
Panhandling provisions could have created an exception for
passive sign-holding, as the Downtown provisions did.  The City

---

[12] The City does not refer to any record evidence suggesting that
these locations are, indeed, dangerous.  Rather, it relies on
the bare assertion that the solicitation of money contains,
inherently, an element of violence.  Such a contention is in a
great deal of tension with *Schaumburg* and its progeny.

could even have allowed for sign-holding in some locations and not others, perhaps on a sidewalk along the edge of a parking lot but not at a driver's door.  An ordinance with a sign-holding exception would clearly restrict less speech, and would do so without any meaningful loss in public safety.[13]

Similarly, the location-based restrictions would prohibit organized charitable groups from soliciting immediate donations in buffer zones.  While there is nothing inherently less threatening about someone raising money for a third-party as opposed to for themselves, it is clear that many organized groups seeking donations — firemen and Girl Scouts, for example — are not widely viewed as threats to public safety.  Yet these groups would also be barred from operating near a parking lot or a bus stop, foreclosing, for example, traditional fundraising locations like sites outside a grocery store entrance.

Nor is a buffer zone always required to protect public safety.  For example, the City's concern about panhandling near the outdoor seating of a restaurant is, essentially, that restaurant patrons who cannot leave mid-meal will be pestered by panhandlers.  Even if this concern touched on public safety

---

[13] Although I loathe to place too much evidence on this point, it bears noting — as illustrative of the unexamined character of this less restrictive alternative — that the mayor of Lowell, in his deposition, did not realize that even passive sign holding was prohibited in these buffer zones.

rather than a business's customer experience, imposing a 20-foot
buffer around the public seating area is not necessary.   That
buffer prohibits panhandling on the sidewalk, not panhandling
from those in the outdoor seating area.   No theory or evidence
has been offered as to how pedestrians walking *near* an outdoor
café are unusually threatened by panhandlers.   While a buffer
zone of some sort might be appropriate around some facilities,
such as ATMs, the Ordinance imposes buffer zones uniformly.[14]   In

---

[14] Plaintiffs also argue that the buffer zones could be smaller
and therefore be less restrictive.  It is of course true that a
ten-foot buffer would restrict less speech than a twenty-foot
buffer.  Taking the "least restrictive means" test literally,
there could be no reason to uphold a twenty-foot buffer: a
nineteen and a half foot buffer would restrict less speech and
surely sacrifice nothing in public safety.  Yet this exercise in
diminishing boundaries, which would whittle buffers down inch by
inch, is not required by the First Amendment.  The number of
feet a buffer zone extends, even under strict scrutiny, is not
"a question of constitutional dimension. . . . it is a
difference only in degree, not a less restrictive alternative in
kind." *Burson* v. *Freeman*, 504 U.S. 191, 210 (1992).  If a
buffer zone approach is constitutionally permissible in this
case, these distances are likely sufficiently tailored, absent a
showing that 20-foot buffers prevent entire categories of speech
(as with the buffer zones in *McCullen*, which the court found to
prevent "sidewalk counseling" in a manner that appeared
compassionate and trustworthy, 134 S.Ct. at 2535), block off
entire neighborhoods from panhandling, or otherwise are
different in kind rather than degree from 10-foot buffers.

   For similar reasons, I find plaintiff's argument that Lowell's
ordinance is more restrictive than other anti-panhandling
provisions across the country unpersuasive.  Of course, the fact
that the Ordinance might be "truly exceptional" is relevant in
addressing the tailoring inquiry, in that it is illustrative of
the seriousness of the burden on speech, *Cutting*, 2015 WL
5306455, at *5.  However, plaintiffs cannot show that Lowell's
ordinance is not the least restrictive means available to
protect public safety simply by pointing to less restrictive

all these ways, Lowell might have enacted a less restrictive

ordinance that was equally protective of public safety.  The

City failed to do so, and the location-based definitions of

aggressive panhandling therefore fail to satisfy strict

scrutiny.

### III.  CONCLUSION

For the reasons set forth above, I GRANT plaintiff's motion

for summary judgment and DENY defendant's motion for summary

judgment,[15] and declare:

---

ordinances elsewhere.  Otherwise, the passage or repeal of an
anti-panhandling ordinance in one city would enlarge or contract
the First Amendment rights of panhandlers everywhere else.
[15] Because no part of the Ordinance survives First Amendment
scrutiny, I do not decide defendant's motion for summary
judgment on plaintiffs' Fourteenth Amendment claims, which
include both due process concerns, *see supra* note 11, and equal
protection claims.  Nevertheless, I note that plaintiffs' equal
protection claims appear essentially coterminous with its First
Amendment claims, because speech is a fundamental right. *See
Speet* v. *Schuette*, 889 F. Supp. 2d 969, 979 (W.D. Mich. 2012)
*aff'd*, 726 F.3d 867 (6th Cir. 2013) ("the Equal Protection
analysis largely duplicates the First Amendment analysis in this
case… strict scrutiny applies."); *Police Dep't of City of
Chicago* v. *Mosley*, 408 U.S. 92, 96 (1972) "[U]nder the Equal
Protection Clause, not to mention the First Amendment itself,
government may not grant the use of a forum to people whose
views it finds acceptable, but deny use to those wishing to
express less favored or more controversial views."
Plaintiffs' additional equal protection theories would likely
be unavailing, however.  It would be difficult to show that this
Ordinance rests on the "bare desire to harm a politically
unpopular group." *City of Cleburne, Tex*. v. *Cleburne Living
Center*, 473 U.S. 432, 446-47 (1985).  Rather, the City's
interests in public safety and protecting tourism are not
disputed.  Moreover, the poor and homeless are not suspect
classes. See *San Antonio Indep. Sch. Dist*. v. *Rodriguez*, 411

Section 222-15 of the City of Lowell Code (the "Ordinance") is in its entirety violative of the United States Constitution[16] because

(A)  The Downtown Panhandling provisions of the Ordinance are violative of the First Amendment of the United States Constitution; and

(B)  The Aggressive Panhandling provisions of the Ordinance are violative of the First Amendment of the United States Constitution, in that none of the ten behaviors identified can be proscribed as they are through the Ordinance.

.

**/s/ Douglas P. Woodlock_**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

U.S. 1, 28 (1973); *Kreimer* v. *Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1269 n. 36 (3d Cir. 1992).
[16] No permanent injunction is required in this case. Massachusetts assumes that its municipalities will "do their duty when disputed questions have been finally adjudicated" and can "rightly be expected to set an example of obedience to law." *Commonwealth* v. *Town of Hudson*, 52 N.E.2d 566, 572 (Mass. 1943). I share that expectation.  Lowell has voluntarily refrained from enforcing the Ordinance while this litigation has been pending and I fully anticipate that it will acquiesce in this decision declaring the Ordinance unconstitutional without further formal coercive relief.  *See also Steffel* v. *Thompson*, 415 U.S. 452, 467 (1974) (declaratory judgments were intended to provide an alternative to injunctions against state officials).